UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 04 C ~~2317~~ 4138 |
| v. ) | |
| ) | Judge George M. Marovich |
| CAPITAL TAX CORPORATION, ) | |
| STEPHEN J. PEDI, and ) | |
| WILLIAM LERCH, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| CAPITAL TAX CORPORATION, ) | |
| ) | |
| Counter-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Counter-Defendant. ) | |
| ) | |
| CAPITAL TAX CORPORATION, ) | |
| ) | |
| Cross-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| STEPHEN J. PEDI, and ) | |
| WILLIAM LERCH, ) | |
| ) | |
| Cross-Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff the United States of America ("United States" or the "government") filed suit against defendants Capital Tax Corporation ("Capital Tax"), Stephen J. Pedi ("Pedi") and William Lerch ("Lerch") alleging claims arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. In Count I, pursuant to CERCLA §§ 107(a) and 113(g)(2), the United States sought to recover from defendants costs it incurred or would incur taking remedial action at a hazardous waste site owned by defendants. In Counts II and III, the United States sought civil penalties (pursuant to CERCLA § 106(b)) and punitive damages (pursuant to CERCLA § 107(c)(3)) against defendants for alleged violations of unilateral administrative orders.

Capital Tax filed counterclaims against the United States. In its first counterclaim, Capital Tax alleges that CERCLA § 106(a) denies a potentially responsible party due process. In its second counterclaim, Capital Tax alleges that the section is an unconstitutional delegation of congressional authority. In its third counterclaim, Capital Tax alleges that it has been denied due process with respect to a CERCLA statutory lien.

The United States has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings with respect to Capital Tax's counterclaims. For the reasons set forth below, the Court grants the United States' motion with respect to Capital Tax's first and second counterclaims and denies the motion with respect to Capital Tax's third counterclaim.

## I. Background

### A. The CERCLA framework

CERCLA (sometimes called the Superfund law) "requires that sites contaminated by toxic wastes be cleaned up by or at the expense of the persons responsible for the contamination." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 660 (7th Cir. 1995). CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)).

Under CERCLA, the EPA has the authority to effectuate toxic waste cleanup in a couple of ways. First, it can take responsive action itself and then seek reimbursement from the potentially responsible party. 42 U.S.C. § 9607(a)(4)(A). Second, the EPA may require the responsible party to clean up the property. 42 U.S.C. § 9606(a). Specifically, the EPA can issue an administrative order setting out the required remedial action. The EPA can enforce its order by filing suit in federal district court, and in that suit, the EPA can also seek civil penalties and punitive damages against a party who failed to comply with the administrative order. 42 U.S.C. §§ 9606(b), 9607(c)(3). The district court cannot, however, grant civil penalties or punitive damages against a party that had "sufficient cause" for not complying with the order. 42 U.S.C. §§ 9606(b), 9607(c)(3).

For its part, the recipient of the administrative order has at least two options upon receiving the order if it does not believe that it is responsible for the cleanup. First, it can decline to comply with the order and wait for the EPA to file an enforcement suit. Alternatively, the recipient can comply with the order and then petition the EPA for reimbursement of its costs plus

-3-

interest. 42 U.S.C. § 9606(b)(2)(A). The purpose of this provision is to "encourage potentially responsible parties to conduct a cleanup expeditiously and postpone litigation about responsibility to a later time." *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1324 (7th Cir. 1990).

In the event the United States cleans up the site itself, CERCLA provides a statutory lien. Specifically, CERCLA § 107(l) grants the United States a statutory lien upon real property for the costs and damages for which a person is liable to the United States. 42 U.S.C. § 9607(l)(1). The lien arises when the United States incurs clean-up costs or when the person is notified of its potential liability. 42 U.S.C. § 9607(l)(2). Until the lien is filed with the appropriate state agency, the lien is "subject to the rights of any purchaser, holder of a security interest, or judgment lien creditor whose interest is perfected" under state law. 42 U.S.C. § 9607(l)(3).

### B. Facts relevant to Capital Tax's counterclaims

For purposes of this motion for judgment on the pleadings, the Court takes as true the allegations in Capital Tax's counterclaims. The Court will also consider the attachments to the counterclaims, which attachments include the unilateral administrative order issued by the EPA to Capital Tax.

In October 2001, Capital Tax purchased property at a tax sale. Specifically, Capital Tax obtained the tax deeds to several, but not all, parcels at 7411 to 7431 S. Green Street in Chicago, Illinois. Once Capital Tax gained access to its property, it discovered stored paint and other materials left by the National Lacquer and Paint Company ("National Lacquer"), which had previously owned the property purchased by Capital Tax and which still owned at least some of

the other parcels at 7411 to 7431 S. Green Street. Capital Tax asked National Lacquer to remove the paint and other materials.

Capital Tax was not the only entity that had noticed the paint and other materials. In April 2002, the City of Chicago's Department of Environment fined National Lacquer for improper storage of waste at the Green Street site. This led Capital Tax to believe that any issues related to the paint and other materials were being addressed. At some point, Capital Tax asked a representative of Chicago's Department of the Environment whether it should be concerned about National Lacquer's paint drums and other containers. Capital Tax alleges that the representative responded that "they are just paint materials." Capital Tax seems to have given no further thought to the drums, paint and other materials on its property, but at some point, the EPA took notice.

On August 15, 2003, the EPA issued a unilateral administrative order ("UAO" or the "Order") to Capital Tax. According to the Order, the site was used to manufacture lacquer and paints for more than forty years and was also used for a paint stripping business. When the EPA inspected the site on August 1, 2003, it found, among other things, 500 drums, 7,000 buckets and 71 tanks of various sizes. Many of the containers were unlabeled and/or leaking. Containers of incompatible materials were stored together. Days later, the EPA returned to take samples. Each sample "exceeded criteria for characteristic hazardous waste . . . for either corrosivity, ignitability, metals content by the toxicity characteristic leaching procedure (TCLP), or for a combination of results." Some of the samples exhibited flashpoints of between 23 and 124 degrees Fahrenheit, and the EPA noted that children had been seen recently playing with fireworks at the site. From this information, the EPA concluded that a number of risk factors

(including exposure by humans or animals to hazardous substances, release of hazardous substances, soil contamination and fire hazard) were present at the site. Accordingly, the EPA concluded that the site may "present an imminent and substantial endangerment to the public health, welfare, or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. § 9606(a)."

The UAO set out the work to be done at the site. Specifically, it ordered Capital Tax to, among other things: (1) remove about 10,000 containers of various sizes, 70 tanks and any spillage of waste materials on the floors and in the soil; (2) remove debris to allow safe access to the containers and tanks; (3) stage drums/containers by chemical compatibility; and (4) remove the materials and clean the residue from the tanks before disposal. The UAO also required Capital Tax to notify the EPA–within three business days after the effective date of the UAO–of its intent to comply with the UAO. (The UAO became effective seven days after it was issued, unless the respondent requested a conference, in which case it became effective five days after the conference.) In addition, the UAO set out the non-compliance penalties, which included civil penalties of up to $32,500 per violation per day and punitive damages of up to three times the amount of any cost incurred by the United States as a result of the violation.

Capital Tax did not comply with the Order. Instead, Capital Tax sent to the EPA several letters in which it denied liability. At some point, the EPA informed Capital Tax that the actions it ordered could cost more than $1,000,000. Ultimately, the EPA took action to clean up the site, and the EPA claims to have spent more than $1,000,000 doing so.

On April 27, 2004, the EPA sent to Capital Tax a letter informing it that EPA intended to perfect a lien against the property pursuant to Section 107(l) of CERCLA, 42 U.S.C. § 9707(l).

Specifically, the letter stated that the EPA intended to perfect the lien (by filing a notice of lien with the Cook County Recorder of Deeds) within fourteen days after it sent the letter. Despite the threat, the EPA did not perfect the lien.

The United States filed suit pursuant to CERCLA against Capital Tax, Pedi and Lerch to recover costs it incurred or would incur taking remedial action at the Green Street site. The United States also seeks civil penalties and punitive damages against defendants for alleged violations of unilateral administrative orders. Capital Tax filed counterclaims against the United States. In its first counterclaim, Capital Tax alleges that CERCLA § 106(a) denies a potentially responsible party due process. In its second counterclaim, Capital Tax alleges that the section is an unconstitutional delegation of congressional authority. In its third counterclaim, Capital Tax alleges that CERCLA's lien provision denies due process.

## II. Standard on a motion for judgment on the pleadings

In considering a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a court applies the same standard it would apply if considering a motion to dismiss pursuant to Rule 12(b)(6). *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chi. Med. School*, 167 F.3d 1170, 1173 n. 2 (7th Cir. 1999). A court grants a motion for judgment on the pleadings only if "it appears beyond doubt that the [non-moving party] cannot prove any facts that would support his claim for relief." *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). The moving party must establish that there are no material issues of fact and that it is entitled to judgment as a matter of law. *Northern Indiana*, 163 F. 3d at 452.

Rule 12(c) allows a judgment on the pleadings alone, and the pleadings include the complaint, the answer and any exhibits attached to the complaint. *Northern Indiana*, 163 F.3d at 452.[1] In considering a motion for judgment on the pleadings, the Court "will accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the [non-moving party]." *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000).

## III. Discussion

### A. Capital Tax's first counterclaim

In its first counterclaim, Capital Tax mounts a constitutional challenge to the CERCLA provisions which allow the EPA to issue unilateral administrative orders (requiring potentially responsible parties to clean up hazardous waste sites) and to seek civil penalties and punitive damages for failure to comply with such orders. Capital Tax claims that the threat of massive penalties (including civil fines of up to $32,500 per day per violation and punitive damages) and the lack of a pre-enforcement hearing constitute a denial of due process. Every court that has

---

[1]The Court rejects Capital Tax's argument that the Court may consider affidavits and other evidence outside of the pleadings. The dicta on which Capital Tax relies (in attempting to convince the Court to consider information outside the pleadings) is based on a Rule 12(b)(6) case, in which the Seventh Circuit made the point that federal courts require simple notice pleading and that a party could survive a motion to dismiss for failure to state a claim with facts asserted in a brief. *Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000) (citing *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) ("we have held that a plaintiff may supplement the complaint with factual narration in an affidavit or brief. (Internal citations omitted.) If the extra assertions make out a claim, then the complaint stands.")). The dicta does not mean, however, that this Court can consider evidence outside the pleadings without converting a motion for judgment on the pleadings into a motion for summary judgment. Fed. R. Civ. P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment,"). The Seventh Circuit enforces the conversion language in Rule 12(c). *Cincinnati Ins. Co. v. Leighton*, 403 F.3d 879, 885 (7th Cir. 2005); *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 453 n. 5 (7th Cir. 1998).

considered these issues has concluded that the statutory scheme does not violate due process. *Employers Ins. of Wausau v. Browner*, 52 F.3d 656 (7th Cir. 1995); *Solid State Circuits, Inc. v. United States EPA*, 812 F.2d 383 (8th Cir. 1987); *Wagner Seed Co. v. Daggett*, 800 F.3d 310 (2d Cir. 1986); *General Electric Co. v. Johnson*, 362 F. Supp.2d 339 (D.D.C. 2005).

The Fifth Amendment to the Constitution states that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const., Amend. V. "[S]ome form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

Capital Tax argues that when the EPA issues a unilateral administrative order, the EPA deprives a potentially responsible party of property without due process of law. The Court disagrees. While the Court agrees that the issuance of the UAO occurs without a prior hearing, the statutory scheme is set up so that no *deprivation* occurs until after a judicial hearing. The UAO is not self-enforcing, and the EPA lacks the power to enforce a UAO. Rather, in order to enforce the cleanup outlined in the UAO, the EPA must file suit in district court. It is that lawsuit that provides the potentially responsible party with due process of law, and that due process occurs before any deprivation. *General Electric Co. v. Johnson*, 362 F. Supp.2d 327, 339 (D.D.C. 2005) ("Under the statutory language and structure, EPA does not through the mere issuance of a UAO under section 106 deprive a [potentially responsible party] of a significant property interest without judicial intervention."); *Employers Ins. of Wausau v. Browner*, 848 F. Supp. 1369, 1374-75 (N.D. Ill. 1994) ("In order to compel compliance with the order and to collect penalties for failure to comply, the EPA is required to bring an enforcement action pursuant to CERCLA § 9606(b)(1). At this stage, the [potentially responsible party "PRP"] is

fully entitled to judicial review of the order, including the question of liability. [Internal citations omitted.] Accordingly, a PRP is fully entitled to obtain judicial review of the EPA's order prior to being deprived of its property."), *aff'd*, 52 F.3d 656 (7th Cir. 1995); *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 218 (1994) (rejecting due process argument where "[a]lthough the Act's civil penalties unquestionably become onerous if petitioner chooses not to comply, the [penalty assessment of the Secretary of the Mine Safety and Health Administration] becomes final and payable only after full review by both the Commission and the appropriate court of appeals."). The mere delay of the due process does not mean that due process was lacking. *See Barmet Aluminum Corp. v. Reilly*, 927 F.2d 289, 295 (6th Cir. 1991) ("The CERCLA statutory scheme, as amended by SARA, merely serves to effectuate a delay in a plaintiff's ability to have a full hearing on the issue of liability and does not substantively affect the adequacy of such hearing.").

Capital Tax also argues that the statutory scheme violates its due process rights in another way: that the penalties are so severe that upon receipt of a UAO, a potentially responsible party is left with the unconstitutional choice between complying with the statute and not obtaining review or suffering crushing penalties. The argument rests on *Ex Parte Young*, where the Supreme Court explained that a law imposing:

> such conditions upon the right to appeal for judicial relief as work an abandonment of the right rather than face the conditions upon which it is offered or may be obtained is . . . unconstitutional. It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights.

*Ex Parte Young*, 209 U.S. 123, 147 (1908). Such laws are, thus, "unconstitutional on their face." *Ex Parte Young*, 209 U.S. at 148. Unfortunately for Capital Tax, the Seventh Circuit has already rejected its argument.

To be sure, a recipient of a UAO does not have an easy choice. The Seventh Circuit has described the problem Capital Tax faced when it received the UAO from the EPA:

> Without the provision authorizing suits for reimbursement of response costs, a person potentially responsible for toxic-waste pollution who was served with a clean-up order would have just two choices: comply with the order, or refuse to comply, in which event the EPA could either seek a mandatory injunction against the refuser, § 9606(a), or hire someone to clean up the polluted site at the EPA's expense and then seek to recover that expense by a suit against the person it had ordered to do the clean-up. § 9613(h)(1). The defendant would have an opportunity in that suit to put the EPA to its proof that the Superfund law really did require the defendant to clean up the site. [Internal citation omitted.] But it could not challenge the order in advance of having to comply; that route is, as we shall see, closed. Its choice would be to comply or to run the risk of being found to have violated a valid order. This would be a hard choice because there are heavy sanctions for disobeying a valid clean-up order, including large civil fines and treble damages. §§ 9606(b)(1), 9607(c)(3). We stress 'valid'; it is of course a good defense to a suit to collect these amercements that the order is invalid. Even if it is valid, the district court in which sanctions are sought can abate them in whole or in part if persuaded that the party had a reasonable though erroneous basis for believing that the clean-up order was invalid. ... Still, there is a risk that the court will not find that the party acted reasonably, and this risk places pressure on the party to comply even if it has serious doubts whether the order is valid. ...
>
> The provision for reimbursement trims the horns of this dilemma by offering a party served with a clean-up order a third way. [Internal citations omitted.] It need not disobey the order and risk heavy sanctions. It need not obey and swallow the heavy costs of compliance. It can obey and then when it has complete the clean-up required by the order sue for the return of its expenses on the ground that it was not a responsible party within the meaning of the statute after all.

*Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 661-662 (7th Cir. 1995).

Unlike in *Ex Parte Young*, Capital Tax is not faced with the decision between (a) not complying, challenging the statute and paying huge penalties if it loses the challenge and (b) complying and thereby foregoing the chance to challenge the order. It has *two* safety nets that were not available in *Ex Parte Young*. First, even if it *loses* its challenge, it is protected from civil penalties and punitive damages both by the "sufficient cause" defense (which disallows such penalties where the potentially responsible party had sufficient cause not to comply) and by the judge's discretion not to order such penalties. This protection avoids the *Ex Parte Young* problem and renders the provisions constitutional. *See Solid State Circuits*, 812 F.3d at 391 ("We are . . . convinced that 'sufficient cause' as used in CERCLA § 107(c)(3) may be constitutionally interpreted to mean that treble damages may not be assessed if the party opposing such damages had an objectively reasonable basis for believing that the EPA's order was either invalid or inapplicable to it."); *Wagner Seed*, 800 F.3d at 316-317 (rejecting *Ex Parte Young* due process challenge to CERCLA § 106 and 107(c)(3)).[2] The second safety net is that Capital Tax could have complied with the UAO and then sought reimbursement from the government on the grounds that it had a valid defense to the order. The Seventh Circuit concluded that these safety nets provide the necessary constitutional protection. *Wausau*, 52 F.3d at 664 ("The risk of losing and being made to pay heavy sanctions, a risk mitigated by the defense of sufficient cause as glossed in *Solid State Circuits*, would not violate the Constitution

---

[2]Capital Tax asserts that the "sufficient cause" safeguard is illusory because it is not "sufficiently discernable" to provide any real protection to a potentially responsible party who has received a unilateral administrative order. The Court need not consider this argument because (as will be explained) the Seventh Circuit has concluded that the existence of the reimbursement provision suffices.

-12-

even if there were no reimbursement provision, 812 F.2d at 389-92; it certainly does not violate it given the additional if imperfect remedy which [the reimbursement] provision grants.").

The United States is entitled to judgment as a matter of law on Capital Tax's first counterclaim, and the Court grants the government's motion for judgment on the pleadings with respect to that claim.

### B. Capital Tax's second counterclaim

In its second counterclaim, Capital Tax asserts that CERCLA § 106(a) is an unconstitutional delegation of legislative power to the executive branch. Section 106(a) provides:

> In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. § 9606(a). Capital Tax argues that the section does not contain "a sufficiently clear guiding principle to which EPA must conform, or the CERCLA scheme otherwise delegates such broad discretion to EPA that it enables EPA to override the Congressional directive contained in CERCLA § 106(a)." Capital Tax asserts that the EPA's actual practice with respect to 106(a) is an "unfettered" use of unilateral administrative orders and that the "divergence" between Congress's intent and the EPA's unfettered use is evidence that Congress failed to lay down

intelligible principles to guide the EPA. For its part, the United States argues that the statute provides intelligible principles.

Article I, § 1 of the Constitution states, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const., Art. I, § 1. The Supreme Court has "long insisted that 'the integrity and maintenance of the system of government ordained by the Constitution' mandate that Congress generally cannot delegate its legislative power to another branch." *Mistretta v. United States*, 488 U.S. 361, 371-372 (1988) (quoting *Field v. Clark*, 143 U.S. 649, 692 (1892)).

Congress may, however, delegate legislative authority without running afoul of the Constitution so long as it sets out an "intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). As the Supreme Court has explained, "our jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power *under broad general directives*." *Mistretta*, 488 U.S. at 372 (emphasis added).

> Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates *the general policy, the public agency which is to apply it, and the boundaries of this delegated authority*.

*American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) (emphasis added).

As a matter of law, the Court concludes that CERCLA § 106(a) is not an unconstitutional delegation of legislative authority. To begin with, it is not clear that the authority delegated to the President (and, in turn, to the EPA) is *legislative* authority rather than executive authority.

-14-

The authority is not, for example, the sort of authority clearly associated with legislating, as was the case in *Mistretta v. United States*, 488 U.S. 361 (1988). There, the delegated authority (which was held to be constitutional) was the *drafting* of sentencing guidelines by the Sentencing Commission. The delegation at issue here—the authority of the President (delegated to the EPA) to secure relief when the President determines that an imminent and substantial endangerment to the public health or welfare or the environment exists—is more executive than legislative. *See Field v. Clark*, 143 U.S. 649, 693 (1892); *see also INS v. Chadha*, 462 U.S. 919, 954 n. 16. In *Field*, the Supreme Court explained that where the President is given the authority to take some action upon the happening of some circumstance, he is exercising executive power:

> Legislative power was exercised when congress declared that the suspension should take effect upon a named contingency. What the president was required to do was simply in execution of the act of congress. It was not the making of law. He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect.

*Field*, 143 U.S. at 693. Similarly, CERCLA § 106(a) allows the President to take specified action when he determines that there is an "imminent and substantial endangerment to the public health or welfare of the environment because of an actual or threatened release of hazardous substances from a facility." 42 U.S.C. § 106(a). Thus, the section does not involve the delegation of legislative authority.

Even if the section were considered a delegation of legislative authority, it is not an unconstitutional delegation because it sets out intelligible principles. In reaching this conclusion, the Court is mindful of the fact that the Supreme Court "has invalidated statutes under the nondelegation doctrine only twice, both times in 1935," (*United States v. Brown*, 334 F.3d 1197 (10th Cir. 2003)) and that no court has concluded that CERCLA § 106(a) violates the

-15-

nondelegation doctrine. The section sets out the general policy, the public agency which is to apply it and the boundaries of the delegated authority. First, the general policy is that the President should use the courts and administrative orders to secure relief against potential environmental hazards. Second, the act delegates the authority to the President, who, in turn, is authorized to delegate the authority. *See* 42 U.S.C. § 9615. (Ultimately, the President delegated the authority to the EPA.) Third, the section limits the power to situations of "imminent and substantial endangerment to the public health or welfare of the environment because of an actual or threatened release of hazardous substances from a facility." *See* 42 U.S.C. § 9606(a). The authority is made even more intelligible by the inclusion of definitions in the statute and by the context of CERCLA's other provisions. The delegation is sufficiently intelligible not to be an unconstitutional delegation of legislative authority.

The Court also rejects Capital Tax's argument that the EPA's "overly-broad" construction of the statute means that Congress failed to provide intelligible principles. That an agency might go beyond its delegated authority does not mean the delegation was unconstitutional. Nor does it mean that the agency will succeed in its attempt to broaden its mandate. The judiciary (and, indeed, Congress) remains available as a check on agency power. *See INS v. Chadha*, 462 U.S. 919, 954 n. 16 (1983) ("Executive action is always subject to check by the terms of the legislation that authorized it; and if that authority is exceeded it is open to judicial review as well as the power of Congress to modify or revoke the authority entirely."); *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946) ("Private rights are protected by access to the courts to test the application of the policy in light of these legislative declarations."); *United States v. Brown*,

334 F.3d 1197, 1212-1213 (10th Cir. 2003) (considering agency's misuse of delegated power after rejecting argument that statute was an unconstitutional delegation of legislative authority).

CERCLA § 106(a) is not an unconstitutional delegation of legislative authority. The United States is entitled to judgment as a matter of law on Capital Tax's second counterclaim, and the Court grants its motion for judgment on the pleadings with respect to that claim.

### C. Capital Tax's third counterclaim

In its third counterclaim, Capital Tax asserts that the lien provisions of CERCLA § 107(l) as applied to Capital Tax's Green Street site violate due process rights. Specifically, Capital Tax asserts that a statutory lien was imposed on its property. Although the EPA threatened to perfect the lien (by filing a notice of lien with the Cook County Recorder of Deeds), there is no allegation that the EPA has perfected the lien. Still, Capital Tax asserts that the existence of the statutory lien deprived Capital Tax of property in that it "cloud[ed] title to the property, impair[ed its] ability to sell or otherwise alienate the property, taint[ed its] credit rating, and reduc[ed] the chance of obtaining financing on the property." (Counterclaim Para. 49). The government denies these allegations. Capital Tax asserts that the lien was imposed without due process (in violation of the Fifth Amendment to the Constitution) because Capital Tax did not receive a hearing in front of a neutral decision-maker before the lien was imposed and because CERCLA § 107(l) does not provide for an immediate post-deprivation hearing.

The government first argues that Capital Tax lacks Article III standing to sue because the government has not yet perfected a lien against Capital Tax. The minimum standing requirements are: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury would be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An "injury in fact" is "an invasion of a legally protected interest" which is both "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. The "party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. On a motion for judgment on the pleadings, the Court considers whether the plaintiff has adequately *alleged* facts supporting standing. *Lujan*, 504 U.S. at 561 (jurisdiction must be established "with the manner and degree of evidence required at the successive stages of the litigation."). If Capital Tax were challenging the due process provided to a potentially responsible party against whom the EPA had filed a lien, the government would be correct in noting that Capital Tax lacks standing. Capital Tax, however, alleges that the statutory lien against it violates due process. Because the statutory lien already exists against Capital Tax, Capital Tax has standing to challenge it.

Next, the government argues that it is entitled to judgment on the pleadings because the lien does not deprive Capital Tax of a property interest. A lien could affect a property interest if it "clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; [and] reduces the chance of obtaining [an] equity loan or additional mortgage." *Connecticuit v. Doehr*, 501 U.S. 1, 11 (1991). The government argues that while the existence of hazardous wastes might be affecting the market value of the property, the statutory lien is not. But this is a motion for judgment on the pleadings, and in its counterclaim, Capital Tax alleges that the lien has "cloud[ed] title to the property, impair[ed its] ability to sell or otherwise alienate the property, taint[ed its] credit rating, and reduc[ed] the chance of obtaining financing on the property." (Counterclaim Para. 49). This issue of fact prevents the Court from granting the

government's motion for judgment on the pleadings, although the Court may conclude otherwise on a motion for summary judgment.

The Court denies the United States' motion for judgment on the pleadings with respect to Capital Tax's third counterclaim.

## IV. Conclusion

For the reasons set forth above, the Court grants the United States' motion for judgment on the pleadings with respect to Capital Tax's first and second counterclaims. The Court denies the United States' motion for judgment on the pleadings with respect to Capital Tax's third counterclaim.

ENTER:

George M. Marovich
United States District Judge

DATED: 5/19/05