# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 4138 |
| v. | ) |
| | ) Judge George M. Marovich |
| | ) |
| CAPITAL TAX CORPORATION, | ) |
| STEPHEN J. PEDI, and | ) |
| WILLIAM LERCH, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| CAPITAL TAX CORPORATION, | ) |
| | ) |
| Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Counter-Defendant. | ) |
| | ) |
| | ) |
| CAPITAL TAX CORPORATION, | ) |
| | ) |
| Cross-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| STEPHEN J. PEDI, and | ) |
| WILLIAM LERCH, | ) |
| | ) |
| Cross-Defendants. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff the United States of America ("United States" or the "government") filed suit against defendants Capital Tax Corporation ("Capital Tax"), Stephen J. Pedi ("Pedi") and William Lerch ("Lerch") alleging claims arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. In Count I, pursuant to CERCLA §§ 107(a) and 113(g)(2), the United States seeks to recover from defendants costs it incurred taking remedial action at a hazardous waste site. In Counts II and III, the United States seeks civil penalties (pursuant to CERCLA § 106(b)) and punitive damages (pursuant to CERCLA § 107(c)(3)) against defendants for alleged violations of unilateral administrative orders. In Count IV, the United States asserts a claim against Lerch for information pursuant to CERCLA § 104(e)(5)(B). Finally, in Count V, the government asserts a claim against Pedi for fraudulent transfer.

The United States has filed a motion for summary judgment as to liability on Count I. (It has also filed a motion for summary judgment as to remedies, but that motion has been continued pending a ruling on this motion for summary judgment.) For the reasons set forth below, the Court grants the government's motion for summary judgment.

**I.      Background**

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. As the Court notes on its website (and has mentioned in multiple opinions), the Court enforces Local Rule 56.1 strictly. *See Thomas v. CitiMortgage, Inc.*, Case No. 03 C 6177, 2005 WL 1712266 at *1 n. 1 (N.D. Ill. Jul. 20, 2005); *Perez v. City of Batavia*, Case No. 98 C 8226, 2004 WL 2967153 at *10 (N.D. Ill.

Nov. 23, 2004); *see also Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to evidence admissible for summary judgment purposes, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). At the summary judgment stage, it is not sufficient merely to deny a fact or to claim a lack of knowledge (as defendants often have with respect to the government's statement of facts). The non-moving party must come forward with contrary evidence. This, however, does not absolve a party of its initial burden of putting forth admissible evidence to support his or its facts. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

Unless otherwise noted, the following facts are undisputed.

This CERCLA suit concerns property located at 7411-7431 South Green Street (the "Site") in Chicago, Illinois. The Site is approximately one acre and contains seven parcels with the following Cook County index numbers: 20-29-230-005 ("Parcel 5"), 20-29-230-026 ("Parcel 26"), 20-29-230-008 ("Parcel 8"), 20-29-230-009 ("Parcel 9"), 20-29-230-010 ("Parcel 10"), 20-29-230-011 ("Parcel 11"), 20-29-230-012 ("Parcel 12") (collectively, the "Site Parcels"). A number of buildings sit on the Site. A warehouse sits on Site Parcel 5. A main office and a warehouse yard sit on Parcel 26. A main mixing room sits on Site Parcel 8. A roller mill room,

a pigment room, a wash department and a ball mill room sit on Site Parcels 9, 10, 11 and 12, respectively. A storage yard, which is just west of those rooms, sits on Site Parcels 9, 10 and 11. Above the rooms is a laboratory. Defendants Pedi and Lerch admit that the Site is a facility under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it consists of areas where hazardous substances have been deposited, stored, disposed of, placed or otherwise came to be located. For the same reasons, defendant Capital Tax admits that the Site constitutes several facilities under CERCLA.

**Pedi and Lerch's involvement with the Site**

Prior to December 1995, a company called the National Lacquer and Paint Company, Inc. operated the Site. It is not clear from the record who owned the National Lacquer and Paint Company, Inc., but it is clear that Pedi and Lerch agreed to purchase the assets and property of the old National Lacquer and Paint Company, Inc. Pedi agreed to put up the money, and Lerch agreed to run the business.

On or about August 16, 1995, someone (it is not clear from the record who) incorporated a new corporation, the National Lacquer Company ("National Lacquer"). Pedi was the sole shareholder upon incorporation, but Lerch and Pedi agreed that at some point in the future, Pedi would transfer half of the shares to Lerch. Lerch became the treasurer of National Lacquer in 1999. Lerch became a fifty percent owner and director of National Lacquer in 2000.

In December 1995, National Lacquer purchased all of the assets–excluding the real property–of the National Lacquer and Paint Company, Inc. The real property was transferred to a trust, in which Pedi owned the sole beneficial interest. Pedi remains the beneficiary of the trust that holds title to Parcel 8 and Parcel 10. From December 12, 1995 to October 30, 2001, Pedi

was the beneficial owner of the trust holding title to Parcels 5, 9, 11 and 26.  From December 12, 1995 to February 14, 2002, Pedi was the beneficiary of the trust that held title to Parcel 12.

Before the December 1995 sale, Pedi inspected the Site.  He noticed "hazardous waste materials" at the Site.  At the time of the sale, the Site contained: 1500 pounds of ethyl acetate, 500 pounds of xylene, 2000 pounds of methylene chloride, 600 pounds of methyl ethyl ketone, 375 pounds of methyl isobutyl ketone and 55 pounds of phosphoric acid.  The parties agree that these substances are listed as hazardous under CERCLA.  Pedi did not take any steps to safeguard the hazardous substances at the Site.

National Lacquer operated at the Site from late l995 to late 2002.  During that time, it reclaimed paint at the Site to produce specialized coatings.  It also stripped furniture.  Lerch, as manager, directed all National Lacquer operations–including paint reclamation–at the Site.  Lerch ordered raw materials and was responsible for directing their use.  In addition, Lerch directed his employees to send raw materials from another business to National Lacquer.  Specifically, Lerch also operated a company called NiChem, and some of the materials used by National Lacquer were shipped to it from NiChem.

In addition, Lerch was also responsible for decisions regarding the handling and disposal of hazardous wastes for National Lacquer.  Lerch admitted that the paints made by National Lacquer were hazardous.  He was responsible for all decisions related to environmental problems at the Site.  Among other things, Lerch contracted with Strong Environmental for the removal, disposal and analysis of hazardous substances at the Site.

Although Pedi believed that Lerch was not running the Site properly, Pedi did nothing about it.

At various points during the time National Lacquer operated the Site, hazardous materials leaked or spilled.  The Site constantly smelled of solvents, which suggested (to Lerch, among others) that the facility was potentially flammable.  In June 1997, a spill at the Site caused a solvent odor in the sewers on Green Street.

In January 1998, the Chicago Department of the Environment ("CDOE") inspected the Site.  It found about 100 old cans of paint in a building with a leaking roof.  It also found that the floor of the building was covered with water and paint from leaking cans.  In May 1998, the CDOE and the Chicago Fire Department conducted an investigation at the Site.  They found hundreds of rusty, damaged and leaking pails, cans and jars.  They also found the roof was still leaking.  Water mixed with product was flowing underneath an exterior door and into the street.

On or about July 30, 1998, Lerch and National Lacquer entered into a settlement agreement with the City of Chicago regarding hazardous waste at the Site.  Under the settlement agreement, Lerch and National Lacquer agreed to "repair or dispose of in an approved manner defective containers which are permitting leakage or spillage throughout the premises."

More generally, the storage yard at the Site contained more than one hundred 55-gallon drums and drums of other sizes.  The drums contained solvents and other hazardous materials.  Throughout the time when National Lacquer operated the Site, the drums leaked.  When the drums leaked, solvents evaporated and left behind a resin.

The warehouse (on Parcel 5) contained numerous damaged cans of paint, some of which leaked or spilled.  Some of the cans continued to leak until the contents could be transferred to other containers.  The leaked paint ran onto the concrete floor of the warehouse.  In addition, the

roof of the warehouse leaked during a portion of the time when National Lacquer operated the Site.

At some point, a National Lacquer employee took "sludge" from the bottom of machinery at the Site and deposited the "sludge" in a neighbor's garbage cans. The "sludge" contained methyl ketone, which the parties agree is a substance listed as hazardous under CERCLA.

### Capital Tax's involvement with the Site

Capital Tax became involved with the Site when the taxes became delinquent and Capital Tax obtained tax deeds to several parcels.

Defendant Capital Tax is an Illinois Corporation, whose shares are owned by Gilbert Balin, Timothy Balin and Jonathan Smith ("Smith"). Capital Tax is in the business of purchasing real estate, primarily by (1) purchasing properties under foreclosure; or (2) bidding at "scavenger" tax sales. When a property is at least two years' delinquent with respect to taxes, it is subject to a scavenger auction. The winning bidder receives a tax certificate for the property. If the property's owner fails to pay the delinquent taxes within a certain period of time, the winning bidder has the right to petition for a tax deed to the property.

Capital Tax's usual practice with respect to scavenger sales was as follows. Gilbert Balin was responsible for visually inspecting properties on which Capital Tax was considering bidding. He conducted a "more in depth" inspection if Capital Tax obtained a tax certificate. That helped Capital Tax to determine whether to obtain a tax deed.

Capital Tax obtained tax deeds for portions of the Site at issue in this case. Before bidding on the property at a scavenger sale, Gilbert Balin visited the Site on behalf of Capital

Tax.  Capital Tax bid on and obtained tax certificates for Parcels 5, 26, 9 and 11.  Gilbert Balin visited the Site again in order to determine whether Capital Tax should obtain tax deeds for the parcels.  By February 2001, Capital Tax was aware that the Site was a paint factory.  On October 30, 2001, Capital Tax obtained tax deeds for Parcels 5, 26, 9 and 11.

Capital Tax later obtained the tax deed for an additional parcel.  On February 14, 2003, Cook County issued Capital Tax a tax deed for Parcel 12.[1]  Thus, Capital Tax currently owns five of the seven parcels at the Site.

When Capital Tax obtained the deeds, however, they intended to resell the property.  Capital Tax had already reached an agreement with Mervyn Dukatt ("Dukatt"), who had worked with Capital Tax in the past, to convey the parcels to Dukatt.  Dukatt paid Capital Tax part but not all of the undisclosed purchase price.  To this day, Dukatt has not paid the remainder of the purchase price.

**The eviction**

It seems that even after Capital Tax obtained deeds to most of the parcels, Lerch was less than anxious to vacate the premises.  When Lerch refused to surrender possession of Parcels 5, 26, 9 and 11, Capital Tax filed with the Circuit Court of Cook County an application for an order of possession.  The Circuit Court of Cook County granted the order of possession, which was effective January 7, 2002.

---

[1]It is not clear from the record whether someone else held title to Parcel 12 between February 14, 2002 and February 14, 2003 or whether the date difference was a result of a typographical error in the statement of material facts.  It is not material to the merits of this motion.

On January 29, 2002, at the request of Capital Tax, deputies from the Cook County Sheriff's office went to the Site to evict Lerch from the parcels owned by Capital Tax. Dukatt was also present at the eviction, and he represented himself to the deputies as an agent of Capital Tax. The undisputed evidence is that the Sheriff's deputies evicted Lerch only from the office and warehouse, which are located on Parcel 26.

There remained the problem of National Lacquer's materials and supplies at the Site. For example, during the January 29, 2002 visit, Dukatt noticed paint cans in the warehouse from where he was standing in the office. Capital Tax deferred to Dukatt with respect to decisions about National Lacquer's materials at the Site. Lerch and Dukatt (unbeknownst to Capital Tax) agreed that Lerch would be allowed to remove National Lacquer property from the office (which was on Parcel 26). Lerch removed some materials but left other materials behind. On subsequent visits to the Site, Dukatt saw numerous cans and drums in the storage yard. Dukatt informed Smith that there was paint at the Site.

Dukatt (on his own behalf) visited the Site several times. He was overseeing work in the garage at Parcel 12. Dukatt had hired workers who, over the course of two or three weeks, cut up and removed the paint machines that had been in the garage. They also repaired and replaced an overhead door and knocked down two walls. When he and his workers were not present, Dukatt kept the office and the garage locked.

Capital Tax, on the other hand, did very little with respect to the parcels it owned. For example, Capital Tax did nothing to safeguard the Site against acts or omissions of third parties. Capital Tax did not test any materials at the Site to determine whether they were hazardous. Capital Tax failed to notice a five-foot by three-foot hole in a door that allowed third parties to

access the Site.  Capital Tax put forth evidence that it did not cause any release of hazardous substances on the parcels it owned.

**The April 2002 inspection**

On April 14, 2002, the Chicago Fire and Police Departments and the Chicago Department of the Environment responded to a call complaining of a spill of hazardous substances at the Site.  Lerch had called the police because he believed individuals working for Capital Tax were moving containers from its parcels to Lerch's parcels.  Emmanuel Adesanya ("Adesanya"), a CDOE engineer who responded to the call, noticed that containers had been moved from the warehouse (on Parcel 5) to the storage yard (on Parcels 9, 10 and 11) as evidenced by the trail of spilled product.  Adesanya noted that the spilled product spelled like lacquer.  Capital Tax denies hiring workers to move any containers.

After visiting the Site, Adesanya and his supervisor proceeded to Capital Tax's office. The parties dispute the substance of the meeting.  The government put forth evidence that Capital Tax's principals refused to meet with the CDOE representatives.  Capital Tax put forth evidence that Smith spoke to Adesanya briefly (about what, the record does not say).  The CDOE issued Capital Tax a notice of violation for "allow[ing] spill of hazardous substance due to container movement."  Capital Tax informed Dukatt of the violation and attended the violation hearing.

At the violation hearing, Smith testified that Adesanya had told him not to worry about the spill because it was merely paint.  Adesanya testified that neither he nor anyone else had made such statements to Smith.

**The July 23, 2003 visit**

On July 23, 2003, CDOE again visited the Site. After the visit, the CDOE inspector, Terry Sheahan ("Sheahan") telephoned Capital Tax and spoke to one of the principals. Sheahan asked Capital Tax to remove the hazardous materials and was told Capital Tax would not.

**The EPA's involvement**

In July 2003, the CDOE referred the Site to the U.S. Environmental Protection Agency ("EPA"). On July 31, 2003, the EPA, Weston Solutions, Inc. (EPA's site contractor), the CDOE and the Chicago Fire Department inspected the Site.

Weston estimated that the Site contained, among other things: (1) 10,000 containers of various sizes, including 500 55-gallon drums; (2) six one-ton totes; (3) four above-ground storage tanks; (4) 27 vats sized between 2,000 and 3,000 gallons; (5) 3,650 five-gallon buckets; (6) 3,405 one-gallon buckets; (7) four 20-gallon buckets; (8) 2,400 laboratory jars and bottles; and (9) ten compressed gas cylinders. Some of the containers were labeled with such chemical names as: epichlorohdpin, butyl acetate, thricholoethane, trichlorethylene, dipropylene monomethyl ether, polybutadiene hydoxyl, etylene dichloride, acetanilide, butyl carbitol, hexamethylene disocyanate, polisocyanate, sodium dischromate, ammonium dichromate, potassium dichromate, chromic acid, sulphuric acid, nitric acid, sodium hydroxide, cobalt and lead acetate. Some containers were leaking, unsealed or unstable due to deterioration. Containers of chemically-incompatible materials were stored together. The garage (on Parcel 12) housed a truck containing leaking drums. The leaked former contents of the drums were flowing into a drainage sewer.

The July 31, 2003 inspection also turned up evidence of trespassing. The inspectors found alcohol bottles, cans, toys and a hypodermic needle.

Finally, the inspectors came upon workers using torches in the garage. The Fire Department ordered them to stop on account of the flammable materials in the buildings. The workers stated that they worked for the "owners," but it is not clear to whom they were referring.

On August 1 and 4, 2003, the EPA and Weston Solutions, Inc. ("Weston") returned to the Site to conduct a removal assessment. Weston collected and analyzed five samples from different Site areas. One such sample came from a leaking drum (labeled "Dirty Solvents") in the storage yard. It contained levels of lead and arsenic above regulatory thresholds. Its flashpoint qualified it as hazardous due to its ignitability. The drum also contained elevated levels of butanone, acetone, toluene, calcium, chromium, copper, iron, magnesium, sodium and zinc. Other samples contained elevated levels of arsenic, cadmium or lead. Others qualified as hazardous by virtue of corrosivity because their pH level was below 2.

During the August 2003 removal assessment, Weston also monitored the air. The level of volatile organic compounds ("VOCs") in the pigment room and wash department were as high as 2,400 parts per million. The level of VOCs in the storage yard was 946 parts per million.

In addition to taking samples, Weston observed conditions in the storage yard. Weston noticed that drums and other containers had deteriorated and posed the risk of release. Some were already leaking, and the leaked material was flowing toward South Green Street. A pit in the storage yard contained 2,540 gallons of hazardous liquid and 55 gallons of hazardous sludge.

The EPA concluded that spills had occurred in the storage yard and warehouse in the past. This conclusion was based on the high levels of lead in the storage yard and warehouse.

Soil testing in the storage yard showed lead concentrations as high as 1,600 milligrams per kilogram. Lead concentrations in the warehouse were 1,100 milligrams per kilogram.

Overall, Weston concluded the entire Site faced the threat of fire or explosion due to the flammability of the materials in the containers, the vapors in the air and the possibility of sparkage from collapsing drums or other structures. The only Site parcel that did not contain leaking containers was Parcel 26.

**EPA's clean-up**

On August 15, 2003, the EPA issued a Unilateral Administrative Order ("UAO") demanding that Capital Tax clean up its Site parcels. Capital Tax did not comply with the UAO. On August 28, 2003, EPA issued a UAO to Pedi and Lerch. The UAO required Pedi to remove hazardous substances from the Site parcels he owned. It also required Lerch to remove all hazardous substances from the Site. Pedi and Lerch failed to comply with the UAO.

When the defendants failed to comply with the UAO's, the EPA cleaned up the Site itself. Beginning on October 6, 2003, the EPA, through contractors, removed more than 18,000 drums and containers. The EPA inspected and cleaned the underground storage tanks and manholes. It excavated the soil, backfilled the area and planted grass. The EPA cleaned the interiors of the buildings to remove potential contamination. Finally, the EPA coated lead-painted tanks to prevent the release of lead. Thus far, the EPA has incurred at least $2,036,914.12 in response costs.

## II.    Standard on a motion for summary judgment

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III.    **Discussion**

CERCLA (sometimes called the Superfund law) "requires that sites contaminated by toxic wastes be cleaned up by or at the expense of the persons responsible for the contamination." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 660 (7th Cir. 1995). CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)).

Under CERCLA, the EPA has the authority to effectuate toxic waste cleanup in a couple of ways. First, it can take responsive action itself and then seek reimbursement from the potentially responsible party. 42 U.S.C. § 9607(a)(4)(A). Second, the EPA may require the responsible party to clean up the property. 42 U.S.C. § 9606(a). Specifically, the EPA can issue an administrative order setting out the required remedial action. The EPA can enforce its order

by filing suit in federal district court, and in that suit, the EPA can also seek civil penalties and punitive damages against a party who failed to comply with the administrative order. 42 U.S.C. §§ 9606(b), 9607(c)(3). The district court cannot, however, grant civil penalties or punitive damages against a party that had "sufficient cause" for not complying with the order. 42 U.S.C. §§ 9606(b), 9607(c)(3).

For its part, the recipient of the administrative order has at least two options upon receiving the order if it does not believe that it is responsible for the cleanup. First, it can decline to comply with the order and wait for the EPA to file an enforcement suit. Alternatively, the recipient can comply with the order and then petition the EPA for reimbursement of its costs plus interest. 42 U.S.C. § 9606(b)(2)(A). The purpose of this provision is to "encourage potentially responsible parties to conduct a cleanup expeditiously and postpone litigation about responsibility to a later time." *Bethlehem Steel Corp. v. Bush*, 918 F.2d 1323, 1324 (7th Cir. 1990).

### A.     CERCLA liability for response costs incurred by the government

To establish liability under CERCLA § 107(a), the government must show: (1) the site is a "facility" under CERCLA; (2) the defendant is a responsible party under § 107(a); (3) a release or threatened release of a hazardous substance; and (4) that the plaintiff incurred response costs. *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); 42 U.S.C. § 9607(a). CERCLA lists the persons who are responsible parties under CERCLA. They include "the owner and operator of a vessel or a facility" and "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(1) & (2).

CERCLA liability is strict.  *Nutrasweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 784 (7th Cir. 2000).  Thus, those who meet the statutory criteria are automatically liable *unless* they establish the affirmative defense–called the innocent landowner defense–set out in the statute.  *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998) ("In recognition that CERCLA liability is strict, Congress created an "innocent landowner" defense").

### 1.      Whether the Site is a facility

CERCLA provides a "broad and detailed" definition of facility.  *United States v. Bestfoods*, 524 U.S. 51, 56 (1998).  CERCLA defines facility as, among other things, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).

The undisputed evidence establishes as a matter of law that the Site is a CERCLA facility.  It is, plainly, an area where a hazardous substance has been deposited, stored or disposed of or otherwise come to be located.  It is undisputed that as of December 1995, the Site housed, among other things, large quantities of ethyl acetate (1500 pounds), xylene (500 pounds), methylene chloride (2000 pounds), and methyl ethyl ketone (600 pounds).  Each of these substances is listed as a hazardous substance under CERCLA.  *See* 40 C.F.R. § 302.4.  As of August 2003, the Site stored thousands of drums and containers of such substances as butyl acetate, chromic acid, nitric acid and lead acetate, each of which is listed as hazardous under CERCLA.  *See* 40 C.F.R. § 302.4.  In early August 2003, several CERCLA-listed hazardous substances (including lead, arsenic, acetone, toluene and chromium) were found in a leaking

drum at the Site. Soil at the Site contained high levels of lead, which is also a CERCLA-listed hazardous substance. Unquestionably, the Site is a facility under CERCLA.[2]

## 2. Whether there was a release or threatened release at the Site

CERCLA defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . ." 42 U.S.C. § 9601(22). Thus, evidence that drums containing hazardous substances were abandoned at a facility is sufficient to establish a release or threat of release under CERCLA. *See Illinois v. Grigoleit Co.*, 104 F. Supp.2d 967, 978 (C.D. Ill. 2000).

The undisputed evidence establishes multiple releases of hazardous substances at the Site. First, the undisputed evidence establishes that when he was evicted, Lerch left behind (i.e., abandoned) barrels and containers of, among other things, butyl acetate, chromic acid, nitric acid and lead acetate. These substances are listed as hazardous under CERCLA. 40 C.F.R. § 302.4. Some of the containers were leaking. Throughout the time that National Lacquer operated at the Site, drums containing solvents and other hazardous materials leaked at the Site such that solvents evaporated. At one point, a National Lacquer employee disposed of (in a neighbor's garbage) sludge containing methyl ketone. Methyl ketone is listed as hazardous under

---

[2]To the extent Capital Tax is arguing that it should not be liable for parcels it did not own, that is not an issue at the liability stage. Divisibility "is a 'judicially crafted allocation principle designed to remediate the harshness of joint and several liability applied under CERCLA § 107(a) on those who have contributed a relatively lesser portion of hazardous substances to a CERCLA facility.'" *U.S. v. Manzo*, 182 F. Supp.2d 385, 404-405 (D. N.J. 2001) (internal citation omitted). As such, it has no bearing on the meaning of "facility" under CERCLA.

CERCLA.  40 C.F.R. § 302.4.  In 1998, the Chicago Department of the Environment witnessed water from a leaking roof mixing with paint products (which Lerch admits contained hazardous substances) from leaking barrels.  The mixture flowed underneath an exterior door and into the street.  It was, thus, not surprising that soil samples from the storage yard showed lead (a hazardous substance) concentrations as high as 1,600 milligrams per kilogram.  In August 2003, the EPA contractor witnessed drums and other containers that were leaking, and the leaked material was flowing toward South Green Street.  The EPA contractor also found a leaking drum containing lead and arsenic–both substances listed as hazardous under CERCLA.  Thus, the undisputed evidence establishes multiple releases of a hazardous substance at the facility.

The undisputed evidence also establishes a threatened release.  The EPA contractor noticed that drums and other containers at the Site were so deteriorated that they posed the threat of leaking.  In addition, the entire Site faced the threat of fire or explosion due to the flammability of the materials in the containers and vapors in the air coupled with potential sparkage as drums collapsed or otherwise deteriorated.

### 3.      Whether the government incurred response costs

It is undisputed that the government has incurred more than $2 million in response costs.

### 4.      Whether the defendants are responsible parties under CERCLA

Finally, the government must show that each defendant is a responsible party under CERCLA § 107(a), i.e., that each defendant is either (1) the owner or operator of a facility; or (2) a person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substance were disposed of.  42 U.S.C. § 9607(a)(1) & (2).  CERCLA defines "owner or operator" as "any person owning or operating" a facility.  *See* 42 U.S.C. §

9601(20)(A).  "The circularity implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings."  *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 419 n.1 (7th Cir. 1994) (quoting *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 156 (7th Cir. 1988)).

### a.        Whether Capital Tax is an owner

It is undisputed that Capital Tax currently owns the deeds to Parcels 5, 26, 9 and 11 of the CERCLA facility.  Accordingly, it is an owner of the facility under CERCLA.

Capital Tax argues, however, that it falls within an exception to the definition of "owner" because it holds title only to protect a security interest.  The definition of "owner" under CERCLA "does not include a person who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility."  42 U.S.C. § 9601(20)(A).  CERCLA defines a "security interest" as "a right under a mortgage, deed of trust, assignment, judgment lien, pledge, security agreement, factoring agreement, or lease and any other right accruing to a person to secure the repayment of money, the performance of a duty, or any other obligation by a nonaffiliated person."  42 U.S.C. § 9601(20)(G)(vi).

Capital Tax's argument is a desperate attempt to avoid the consequences of its business.  It is undisputed that Capital Tax's business is to purchase and re-sell real estate for a profit.  To ensure that it "buys low and sells high," it bids on property at tax scavenger auctions and then, after obtaining title, re-sells the property, preferably at a profit.  No record evidence suggests that

Capital Tax held title to Parcels 5, 26, 9 and 11 as a means of protecting a "security interest" as opposed to holding title as an investor seeking a profit upon resale. True, Capital Tax was planning to make a quick profit by lining up a buyer to sell to immediately upon taking title. True, that buyer never paid the entire purchase price. But that does not make Capital Tax's interest a security interest. It did not, for example, loan money to the previous owner–Pedi–and take title to secure its interest in the loan. Nor is there any evidence in the record that Capital Tax loaned money to Dukatt and took title in the facility to secure the loan. Indeed, the fact that Dukatt has never owned the facility belies such a theory. No evidence supports Capital Tax's argument that it held title to protect a "security interest." It is, as a matter of law, an owner of the facility for purposes of CERCLA.

### b.      Whether Lerch is a responsible party

Lerch is a responsible party under CERCLA if "at the time of disposal of any hazardous substance" he "owned or operated any facility at which any hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2). As with "owner," the Court applies the plain meaning of "operator" since CERCLA defines it circularly. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 419 n.1 (7th Cir. 1994) ("The circularity implies, however, that the statutory terms have their ordinary meanings rather than unusual or technical meanings."); *see also United States v. Bestfoods*, 524 U.S. 51, 65 (1998) ("Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. . . . This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice."). As the Supreme Court has explained, the plain meaning

of operator under CERCLA is one who "manage[s], direct[s], or conduct[s] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66-67. As noted above, to be liable, Lerch must have been an operator at the time of disposal. Under CERCLA, "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); 42 U.S.C. § 9601(29) ("'disposal' . . . shall have the meaning provided in section 1004 of the Solid Waste Disposal Act," 42 U.S.C. § 6903(3)).

The undisputed evidence establishes, as a matter of law, that Lerch was an operator of the Site from late 1995 to late 2002. During that time, Lerch was the manager of National Lacquer's operations at the Site. Lerch directed all National Lacquer operations, including paint reclamation. Among other things, he was responsible for all decisions related to environmental issues at the Site. Furthermore, the undisputed evidence establishes the "disposal" of hazardous substances while Lerch managed the National Lacquer operations. Lerch admitted that the paints made by National Lacquer were hazardous. In 1998, the Chicago Department of the Environmental found about one hundred old cans of paint in a building with a leaking roof. The floor was covered with a mixture of water and paint from leaking cans, and the water mixed with product flowed underneath an exterior door into the street. Drums containing hazardous substances leaked throughout the time National Lacquer operated the Site. A National Lacquer employee disposed of hazardous sludge in a neighbor's garbage. Accordingly, the undisputed

evidence establishes as a matter of law that Lerch operated the Site at the time of a disposal of hazardous substances. As a matter of law, he is a responsible party under CERCLA.

### c.       Whether Pedi is a responsible party

As the government points out, it is undisputed that Pedi is currently the beneficiary of the trust that holds title to Parcels 8 and 10. From December 12, 1995 to at least October 2001, Pedi was also the beneficiary of trusts that held title to Parcels 5, 9,11, 26 and 12. Given that "owner" is to be given its ordinary meaning, this Court concludes that the beneficiary of a trust holding title to a facility is the owner under CERCLA. *See American Nat'l Bank v. Harcros Chem., Inc.*, Case No. 95 C 3750, 1997 WL 281295 at *17 (N.D. Ill. May 20, 1997) (noting that "[t]he Illinois Supreme Court has held that for all practical purposes the beneficiary of a land trust is to be treated as the true owner of the trust property" and concluding that the trust was not an owner under CERCLA). Pedi does not dispute this conclusion.

Accordingly, the undisputed evidence establishes that Pedi is a responsible party under CERCLA. First, he is a current owner of the facility, and, second, he was the owner of the facility at the time of disposal (i.e., while National Lacquer operated the Site, as described in Sect. A.4.b., above). *See Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994) ("A responsible person includes the current owner and any person who formerly owned or operated the facility in question at a time of" disposal).

The United States has met its burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law with respect to the elements of its CERCLA § 107(a) claim against defendants. Only if each defendant can show that it or he is

entitled to a trial on his or its affirmative defense can that defendant survive summary judgment on Count I.

## B.    The innocent landowner defense

Given that the government has put forth sufficient evidence to entitle it to summary judgment as to liability, each three defendant can escape CERCLA's strict liability only if he or it puts forth sufficient evidence to create an issue of fact on the affirmative defense. CERCLA § 107(b) provides as follows:

> There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of hazardous substance and damages resulting therefrom were caused *solely* by:
> (1) an act of God;
> (2) an act of war;
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant . . . if the defendant establishes by a preponderance of the evidence that:
>     (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and
>     (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions; or
> (4) any combination of the foregoing paragraphs.

*See* 42 U.S.C. § 9607(b) (emphasis added).[3]

---

[3]Congress amended the affirmative defense, effective January 10, 2002. Because the amended affirmative defense places additional burdens on defendants to establish the affirmative defense and because Congress did not expressly state that the amendment should apply retroactively, the Court agrees with the courts that have concluded that the amended affirmative defense does not apply to events that occurred before it was enacted. *1325 "G" Street Assoc., LP v. Rockwood Pigments NA, Inc.*, Case No. 2002-1622, 2004 WL 2191709 at *10 (D. Md. Sept. 7, 2004); *United States v. Domenic Lombardi Realty, Inc.*, 290 F. Supp.2d 198, 210 (D. R.I. 2003). In this case, however, it makes no difference whether the Court applies the pre- or post-2002 version, because the determinative portions of the affirmative defense are the same in

1.      **Pedi fails to create an issue of fact as to the innocent landowner defense**

Pedi asserts the innocent landowner defense.  The government put forth evidence that Pedi does not qualify for the innocent landowner defense for at least two reasons.  First, Pedi had a contractual relationship with Lerch.  Lerch and Pedi agreed to put up the money for National Lacquer and Lerch agreed to run the business.  In addition, Pedi agreed to transfer half of the National Lacquer shares to Pedi.  The second reason why Pedi is not entitled to the innocent landowner defense is that the undisputed evidence shows that Pedi noticed "hazardous" waste materials at the Site and did not take *any* steps to safeguard the materials.  Even when Pedi believed that Lerch was not doing a proper job at the Site, he still did nothing about it.  If a defendant is aware of the hazardous materials and takes no steps to remove the substances or reduce the threat, he cannot establish the innocent landowner affirmative defense.  *Kerr-McGee Chemical Corp.*, 14 F.3d 321, 325 (7th Cir. 1994).

Pedi has put forth no evidence to create an issue of fact with respect to the affirmative defense.  Instead, Pedi argues:

> Whether Mr. Pedi can establish the elements of the Third Party Innocent Landowner Defense is subject to proof at trial.  The elements are very fact specific and there is not evidence that demonstrates that this defense cannot be proved at trial or that the United States can prove any of the conclusions it alleges.  As the facts of the case unfolds [sic] and the relationship of the parties are proven, the liability of the defense will be decided.  The United States asks this Court to conclude that Steven Pedi cannot mount a defense prior to any evidence being presented which is clearly and unfairly detrimental to Mr. Pedi.

(Pedi's Brief at 3).

the pre- and post-2002 versions of the statute.

The argument baffles the Court, as this is the summary judgment stage. At this stage, it is Pedi's responsibility to come forward with admissible *evidence* sufficient to create an issue of fact on *his* affirmative defense. In order to survive summary judgment, a defendant–who bears the burden of proof at trial on an affirmative defense–must put forth sufficient evidence to create an issue of fact on the affirmative defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986) (summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."); *Springfield Oil Services, Inc. v. Mermelstein*, 914 F. Supp. 258, 264 (N.D. Ill. 1996). In order to survive summary judgment (and, hence, get a trial on his affirmative defense), Pedi had to come forward with some admissible evidence to show that there is an issue of fact to be decided at trial.

Pedi failed to put forth *any* evidence, let alone evidence sufficient to survive summary judgment. Pedi failed even to *file* a statement of additional facts material to the government's motion for summary judgment. He has failed to meet his burden with respect to his affirmative defense, and the government is entitled to judgment as a matter of law against Pedi on its claim under CERCLA § 107(a). The United States is granted summary judgment as to liability against Pedi on Count I.

### 2.       Lerch fails to establish the innocent landowner defense

Lerch, too, attempts to avail himself of the innocent landowner defense. In his brief, he states, "Our argument is that the facts and circumstances will establish that Mr. Lerch exercised due care in handling the hazardous material." Although Lerch, too, failed to submit a statement of additional material facts, he points out, in support of his affirmative defense, that it was he

who reported to the Chicago Police Department the potential movement of hazardous wastes, an undisputed fact which the government included in its statement of facts. This is not, however, enough to create an issue of fact on his affirmative defense.

The main reason Lerch cannot, as a matter of law, avail himself of the innocent landowner defense is that it requires him to show that the release or threat of release of hazardous substances were caused *solely* by a *third party* who is not an employee. Lerch can never make that showing because the undisputed evidence is that *he* caused a release or threat of release. Among other things, Lerch abandoned drums of hazardous materials at the facility, which constitutes a release under CERCLA. In addition, while Lerch operated National Lacquer, one of its employees disposed of sludge (which contained a CERCLA-listed hazardous substance) in the neighbor's garbage. In addition, Lerch has put forth no evidence that other releases (such as the leaking containers of hazardous substances and the hazardous paint/water mixture flowing out the door) during the time he operated National Lacquer were caused by third parties. Accordingly, as a matter of law, Lerch cannot establish the innocent landowner affirmative defense. The government is entitled to judgment as a matter of law against Lerch on Count I. The Court grants the government summary judgment as to liability against Lerch on Count I.

### 3. Capital Tax's affirmative defense

Capital Tax, the only defendant that filed a statement of additional material facts, comes closer than the other two defendants to putting forth sufficient evidence to create an issue of fact on the affirmative defense. First, with respect to the first prong–that the release was caused

solely by a third party–Capital Tax put forth an affidavit stating that it did not cause any release at the Site.

In order to survive summary judgment, Capital Tax must also put forth sufficient evidence to create an issue of fact as to whether it "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substances, in light of all relevant facts and circumstances" *and* that it "took precautions against" the acts of third parties.  42 U.S.C. § 9607(b)(3)(a) & (b).  The caselaw is clear that one has failed to exercise the necessary due care when he does nothing to remove the hazardous substance or prevent further release.  *See Westfarm Assoc. Ltd. Partnership v. Washington Sub. Sanitary Comm'n*, 66 F.3d 669, 683 (4th Cir. 1995) ("The undisputed evidence at summary judgment indicated that [defendant] knew from inspecting [lessee's] facility that [lessee] used PCE and knew that [lessee] poured hazardous substances into the sewer. . . . [Defendant] was also aware that cracks were present in its sewer. . . . [Defendant] had the power to abate the foreseeable release of PCE, yet failed to exercise that power.  In light of such failure, we cannot find that any genuine dispute was created that [defendant] exercised due care . . . such as would have entitled it to the 'innocent landowner' defense."); *United States v. Domenic Lombardi Realty, Inc.*, 204 F. Supp.2d 318, 335 (D.R.I. 2002) ("under no circumstances will 'no care' be considered 'due care.'"); *United States v. Meyer*, 120 F. Supp.2d 635, 641 (W.D. Mich. 1999) ("[Defendant] took no action when [informed] that [third party's] sewer effluents included hazardous substances, either to prevent [third party] from releasing these substances to the eastern and perimeter sewer lines, remove [third party] from the property or prevent leaking or leaching from the sewer lines.  Accordingly, [defendant] is not protected from liability by the

'innocent landowner' or 'third party' defense."). Nor does "wilful or negligent blindness" suffice. *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir. 1988). Rather, the exercise of due care (which connotes the taking of some action) requires some effort to prevent further harm. *See Franklin Cty. Convention Facilities Authority v. American Premier Underwriters, Inc.*, 240 F.3d 534, 548 (6th Cir. 2001) (Even though the defendant played no role in placing the hazardous substance at the Site, the court concluded "that [defendant] failed to exercise due care after discovering the box [containing a hazardous substance]. Although it immediately ceased work and contacted an environmental consultant, for some unexplained reason [defendant] allowed a significant amount of creosote to migrate approximately forty-five feet, through an open sewer trench.").

Here, Capital Tax conflates the requirement that it take precaution with the requirement that it exercise due care. It argues that it exercised due care by keeping the premises locked and by not moving the containers of hazardous materials. The precaution and due care requirements are distinct elements, each of which requires proof. Locking the doors to third parties and ignoring the hazardous substances inside is not, as a matter of law, an exercise of due care. Capital Tax was required to take some action when it became aware of the hazardous substances. It is undisputed that Capital Tax did nothing. It is undisputed that Capital Tax knew before it obtained the tax deeds that the Site had been used as a paint factory. Capital Tax knew that Lerch left behind drums and containers of substances. In April 2002, CDOE issued Capital Tax a notice of violation for allowing a spill of hazardous substances. Capital Tax attended the violation hearing, so it knew no later than April 2002 that hazardous substances were on its property. Capital Tax argues that it does not know what it could have done to exercise due care,

but the Court can think of many things it could have done, starting with sealing leaking containers and mopping up (and properly disposing of any mopped up substances) those substances that were already leaking on its property. It matters not that Capital Tax did not put the hazardous substances there. To establish the affirmative defense it must establish it "exercised due care" with respect to the hazardous substances regardless of how the hazardous substances arrived. Even in July 2003, when a CDOE inspector asked Capital Tax to remove the hazardous substances, Capital Tax refused. It is undisputed that Capital Tax never took any action to prevent further releases. Accordingly, the Court concludes as a matter of law that Capital Tax has failed to put forth sufficient evidence to survive summary judgment with respect to its affirmative defense.

The government is entitled to judgment as a matter of law against Capital Tax on its CERCLA § 107(a) claim against Capital Tax. The Court grants the government summary judgment as to liability against Capital Tax on Count I.

## IV.   Conclusion

For the reasons set forth above, the Court grants the government's motion [109] for summary judgment and hereby grants summary judgment as to liability to the United States and against the defendants on Count I. The United States has filed a motion for summary judgment on costs and penalties. Defendants' responses to that motion are due January 29, 2007. Plaintiff's reply is due February 19, 2007.

ENTER:

_George M. Marovich_

George M. Marovich

United States District Judge

DATED:January 4, 2007