# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 04 C 4138 |
| v. | ) |
| | ) Judge George M. Marovich |
| | ) |
| CAPITAL TAX CORPORATION, | ) |
| STEPHEN J. PEDI, and | ) |
| WILLIAM LERCH, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| CAPITAL TAX CORPORATION, | ) |
| | ) |
| Cross-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) |
| STEPHEN J. PEDI, and | ) |
| WILLIAM LERCH, | ) |
| | ) |
| Cross-Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff the United States of America ("United States" or the "government") filed suit

against defendants Capital Tax Corporation ("Capital Tax"), Stephen J. Pedi ("Pedi") and

William Lerch ("Lerch") alleging claims arising under the Comprehensive Environmental

Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675. The Court

has already found each defendant liable to the government on Count I, pursuant to CERCLA §§

107(a) and 113(g)(2). The United States has filed a second motion for summary judgment, this

time with respect to damages.  The United States seeks to recover from defendants costs it incurred taking remedial action at a hazardous waste site.  In addition, in Counts II and III, the United States seeks civil penalties (pursuant to CERCLA § 106(b)) and punitive damages (pursuant to CERCLA § 107(c)(3)) against defendants for alleged violations of unilateral administrative orders.  In Count IV, the United States asserts a claim against Lerch for failing to provide information in violation of CERCLA § 104(e)(5)(B).

For the reasons set forth below, the Court grants in part the government's motion for summary judgment.[1]

## I.    Background

Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment.  The Court enforces Local Rule 56.1 strictly.  *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004).  Facts that are argued but do not conform with the rule are not considered by the Court.  For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed.  Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to evidence admissible for summary judgment purposes, the Court deems the fact admitted.  *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004).  At the summary judgment stage, it is not sufficient merely to deny

---

[1]The government's original motion was against defendants Stephen Pedi ("Pedi"), William Lerch ("Lerch") and Capital Tax Corporation ("Capital Tax").  The government reached a settlement agreement with Pedi and has moved the Court to approve a consent decree with respect to its claims against Pedi.  The Court holds in abeyance the portion of the motion for summary judgment having to do with Pedi.

a fact or to claim a lack of knowledge (as defendants often have with respect to the government's statement of facts). The non-moving party must come forward with contrary evidence. This, however, does not absolve a party of its initial burden of putting forth admissible evidence to support his or its facts. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court. For example, Capital Tax asserted in its statement of facts that "40% of the hazardous material removed originated on parcels 8 and 10." Although Capital Tax cites evidence to support the asserted fact, that evidence is not the record. Accordingly, the Court deems that asserted fact not supported, and the Court does not consider that fact.

Unless otherwise noted, the following facts are undisputed. The Court has already recounted the undisputed facts in another opinion. It reiterates here only those facts relevant to the issue of remedies.

This CERCLA suit concerns property located at 7411-7431 South Green Street (the "Site") in Chicago, Illinois. The Site is approximately one acre and contains seven parcels with the following Cook County index numbers: 20-29-230-005 ("Parcel 5"), 20-29-230-026 ("Parcel 26"), 20-29-230-008 ("Parcel 8"), 20-29-230-009 ("Parcel 9"), 20-29-230-010 ("Parcel 10"), 20-29-230-011 ("Parcel 11"), 20-29-230-012 ("Parcel 12") (collectively, the "Site Parcels"). A number of buildings sit on the Site. A warehouse sits on Site Parcel 5. A main office and a warehouse yard sit on Parcel 26. A main mixing room sits on Site Parcel 8. A roller mill room, a pigment room, a wash department and a ball mill room sit on Site Parcels 9, 10, 11 and 12, respectively. A storage yard, which is just west of those rooms, sits on Site Parcels 9, 10 and 11. Above the rooms is a laboratory.

**Defendants' involvement with the Site**

Capital Tax became involved with the Site when the taxes became delinquent and Capital Tax obtained tax deeds to several parcels. Currently, Capital Tax owns parcels 5, 9, 11, 12 and 26. On October 30, 2001, Capital Tax obtained tax deeds for Parcels 5, 26, 9 and 11. It obtained the tax deed for Parcel 12 no later than February 14, 2003. By February 2001, Capital Tax was aware that the Site was a paint factory.

Prior to December 1995, a company called the National Lacquer and Paint Company, Inc. operated the Site. Pedi and Lerch took over in 2005. Technically, the National Lacquer Company (of which Pedi was the sole shareholder from its August 1995 incorporation until Lerch became a 50-percent shareholder in 2000) agreed to purchase the assets and property of the old National Lacquer and Paint Company, Inc. The real property was transferred to a trust, in which Pedi owned the sole beneficial interest. Pedi remains the beneficiary of the trust that holds title to Parcel 8 and Parcel 10. From December 12, 1995 to October 30, 2001, Pedi was the beneficial owner of the trust holding title to Parcels 5, 9, 11 and 26. From December 12, 1995 to February 14, 2002, Pedi was the beneficiary of the trust that held title to Parcel 12.

**History of hazardous waste disposal at the Site**

Before the December 1995 sale, Pedi inspected the Site. He noticed "hazardous waste materials" at the Site. At the time of the sale, the Site contained: 1500 pounds of ethyl acetate, 500 pounds of xylene, 2000 pounds of methylene chloride, 600 pounds of methyl ethyl ketone, 375 pounds of methyl isobutyl ketone and 55 pounds of phosphoric acid. The parties agree that these substances are listed as hazardous under CERCLA. Pedi did not take any steps to safeguard the hazardous substances at the Site.

National Lacquer Company ("National Lacquer") operated at the Site from late l995 to late 2002. During that time, it reclaimed paint at the Site to produce specialized coatings. It also stripped furniture. Lerch, as manager, directed all National Lacquer operations–including paint reclamation–at the Site. Lerch ordered raw materials and was responsible for directing their use. In addition, Lerch directed his employees to send raw materials from another business to National Lacquer. Specifically, Lerch also operated a company called NiChem, and some of the materials used by National Lacquer were shipped to it from NiChem.

In addition, Lerch was also responsible for decisions regarding the handling and disposal of hazardous wastes for National Lacquer. Lerch admitted that the paints made by National Lacquer were hazardous. He was responsible for all decisions related to environmental problems at the Site. Among other things, Lerch contracted with Strong Environmental for the removal, disposal and analysis of hazardous substances at the Site.

Although Pedi believed that Lerch was not running the Site properly, Pedi did nothing about it.

At various points during the time National Lacquer operated the Site, hazardous materials leaked or spilled. The Site constantly smelled of solvents, which suggested (to Lerch, among others) that the facility was potentially flammable. In June 1997, a spill at the Site caused a solvent odor in the sewers on Green Street.

In January 1998, the Chicago Department of the Environment ("CDOE") inspected the Site. It found about 100 old cans of paint in a building with a leaking roof. It also found that the floor of the building was covered with water and paint from leaking cans. In May 1998, the CDOE and the Chicago Fire Department conducted an investigation at the Site. They found

hundreds of rusty, damaged and leaking pails, cans and jars.  They also found the roof was still leaking.  Water mixed with product was flowing underneath an exterior door and into the street.

On or about July 30, 1998, Lerch and National Lacquer entered into a settlement agreement with the City of Chicago regarding hazardous waste at the Site.  Under the settlement agreement, Lerch and National Lacquer agreed to "repair or dispose of in an approved manner defective containers which are permitting leakage or spillage throughout the premises."

More generally, the storage yard at the Site contained more than one hundred 55-gallon drums and drums of other sizes.  The drums contained solvents and other hazardous materials.  Throughout the time when National Lacquer operated the Site, the drums leaked.  When the drums leaked, solvents evaporated and left behind a resin.

The warehouse (on Parcel 5) contained numerous damaged cans of paint, some of which leaked or spilled.  Some of the cans continued to leak until the contents could be transferred to other containers.  The leaked paint ran onto the concrete floor of the warehouse.  In addition, the roof of the warehouse leaked during a portion of the time when National Lacquer operated the Site.

At some point, a National Lacquer employee took "sludge" from the bottom of machinery at the Site and deposited the "sludge" in a neighbor's garbage cans.  The "sludge" contained methyl ketone, which the parties agree is a substance listed as hazardous under CERCLA.

**Activity at the Site since Capital Tax became involved**

When Capital Tax obtained the deeds, it intended to resell the property. Capital Tax had already reached an agreement with Mervyn Dukatt ("Dukatt"), who had worked with Capital Tax in the past, to convey the parcels to Dukatt. Dukatt paid Capital Tax part but not all of the undisclosed purchase price. To this day, Dukatt has not paid the remainder of the purchase price.

Dukatt (on his own behalf) visited the Site several times. He was overseeing work in the garage at Parcel 12. Dukatt had hired workers who, over the course of two or three weeks, cut up and removed the paint machines that had been in the garage. They also repaired and replaced an overhead door and knocked down two walls. When he and his workers were not present, Dukatt kept the office and the garage locked.

Capital Tax, on the other hand, did very little with respect to the parcels it owned. For example, Capital Tax did nothing to safeguard the Site against acts or omissions of third parties. Capital Tax did not test any materials at the Site to determine whether they were hazardous. Capital Tax failed to notice a five-foot by three-foot hole in a door that allowed third parties to access the Site. Capital Tax put forth evidence that it did not cause any release of hazardous substances on the parcels it owned.

**The April 2002 inspection**

On April 14, 2002, the Chicago Fire and Police Departments and the Chicago Department of the Environment responded to a call complaining of a spill of hazardous substances at the Site. Lerch had called the police because he believed individuals working for Capital Tax were moving containers from its parcels to Lerch's parcels. Emmanuel Adesanya ("Adesanya"), a CDOE engineer who responded to the call, noticed that containers had been

moved from the warehouse (on Parcel 5) to the storage yard (on Parcels 9, 10 and 11) as evidenced by the trail of spilled product. Adesanya noted that the spilled product spelled like lacquer. Capital Tax denies hiring workers to move any containers.

After visiting the Site, Adesanya and his supervisor proceeded to Capital Tax's office. The parties dispute the substance of the meeting. The government put forth evidence that Capital Tax's principals refused to meet with the CDOE representatives. Capital Tax put forth evidence that Smith spoke to Adesanya briefly (about what, the record does not say). The CDOE issued Capital Tax a notice of violation for "allow[ing] spill of hazardous substance due to container movement." Capital Tax informed Dukatt of the violation and attended the violation hearing.

At the violation hearing, Smith testified that Adesanya had told him not to worry about the spill because it was merely paint. Adesanya testified that neither he nor anyone else had made such statements to Smith.

**The July 23, 2003 visit**

On July 23, 2003, CDOE again visited the Site. After the visit, the CDOE inspector, Terry Sheahan ("Sheahan") telephoned Capital Tax and spoke to one of the principals. Sheahan asked Capital Tax to remove the hazardous materials and was told Capital Tax would not.

**The EPA's involvement**

In July 2003, the CDOE referred the Site to the U.S. Environmental Protection Agency ("EPA"). On July 31, 2003, the EPA, Weston Solutions, Inc. (EPA's site contractor), the CDOE and the Chicago Fire Department inspected the Site.

Weston estimated that the Site contained, among other things: (1) 10,000 containers of various sizes, including 500 55-gallon drums; (2) six one-ton totes; (3) four above-ground storage tanks; (4) 27 vats sized between 2,000 and 3,000 gallons; (5) 3,650 five-gallon buckets; (6) 3,405 one-gallon buckets; (7) four 20-gallon buckets; (8) 2,400 laboratory jars and bottles; and (9) ten compressed gas cylinders. Some of the containers were labeled with such chemical names as: epichlorohdpin, butyl acetate, tricholoethane, trichlorethylene, dipropylene monomethyl ether, polybutadiene hydoxyl, etylene dichloride, acetanilide, butyl carbitol, hexamethylene disocyanate, polisocyanate, sodium dischromate, ammonium dichromate, potassium dichromate, chromic acid, sulphuric acid, nitric acid, sodium hydroxide, cobalt and lead acetate. Some containers were leaking, unsealed or unstable due to deterioration. Containers of chemically-incompatible materials were stored together. The garage (on Parcel 12) housed a truck containing leaking drums. The leaked former contents of the drums were flowing into a drainage sewer.

The July 31, 2003 inspection also turned up evidence of trespassing. The inspectors found alcohol bottles, cans, toys and a hypodermic needle.

Finally, the inspectors came upon workers using torches in the garage. The Fire Department ordered them to stop on account of the flammable materials in the buildings. The workers stated that they worked for the "owners," but it is not clear to whom they were referring.

On August 1 and 4, 2003, the EPA and Weston Solutions, Inc. ("Weston") returned to the Site to conduct a removal assessment. Weston collected and analyzed five samples from different Site areas. One such sample came from a leaking drum (labeled "Dirty Solvents") in the storage yard. It contained levels of lead and arsenic above regulatory thresholds. Its

flashpoint qualified it as hazardous due to its ignitability.  The drum also contained elevated levels of butanone, acetone, toluene, calcium, chromium, copper, iron, magnesium, sodium and zinc.  Other samples contained elevated levels of arsenic, cadmium or lead.  Others qualified as hazardous by virtue of corrosivity because their pH level was below 2.

During the August 2003 removal assessment, Weston also monitored the air.  The level of volatile organic compounds ("VOCs") in the pigment room and wash department were as high as 2,400 parts per million.  The level of VOCs in the storage yard was 946 parts per million.

In addition to taking samples, Weston observed conditions in the storage yard.  Weston noticed that drums and other containers had deteriorated and posed the risk of release.  Some were already leaking, and the leaked material was flowing toward South Green Street.  A pit in the storage yard contained 2,540 gallons of hazardous liquid and 55 gallons of hazardous sludge.

The EPA concluded that spills had occurred in the storage yard and warehouse in the past.  This conclusion was based on the high levels of lead in the storage yard and warehouse.  Soil testing in the storage yard showed lead concentrations as high as 1,600 milligrams per kilogram.  Lead concentrations in the warehouse were 1,100 milligrams per kilogram.

Overall, Weston concluded the entire Site faced the threat of fire or explosion due to the flammability of the materials in the containers, the vapors in the air and the possibility of sparkage from collapsing drums or other structures.  The only Site parcel that did not contain leaking containers was Parcel 26.

**EPA's clean-up**

On August 15, 2003, the EPA issued a Unilateral Administrative Order ("UAO") demanding that Capital Tax clean up its Site parcels.  Capital Tax did not comply with the UAO.

On August 28, 2003, EPA issued a UAO to Pedi and Lerch.  The UAO required Pedi to remove hazardous substances from the Site parcels he owned.  It also required Lerch to remove all hazardous substances from the Site.  Pedi and Lerch failed to comply with the UAO.  Each of the defendants admits that his or its UAO was properly issued.

In addition to issuing the UAOs, the EPA also issued an information request to Lerch by certified mail on August 8, 2003.  The request asked for such information as the types of hazardous substances used and released at the Site and how the substances were obtained, stored and disposed of.  The request required a response within seven days.  The EPA hand-delivered to Lerch a follow-up letter on October 20, 2003.  On November 14, 2003, it sent another follow-up letter, this time by certified mail.  Lerch received the information request and follow-up letters but did not respond.

When each of the defendants failed to comply with his or its respective UAO, the EPA cleaned up the Site itself.  Beginning on October 6, 2003, the EPA, through contractors, removed more than 20,000 drums and containers.  The EPA inspected and cleaned the underground storage tanks and manholes.  It excavated the soil, backfilled the area and planted grass.  The EPA cleaned the interiors of the buildings to remove potential contamination.  Finally, the EPA coated lead-painted tanks to prevent the release of lead.  The EPA and its contractors completed the removal by June 17, 2004.

Before it starting removing, cleaning and excavating, the EPA surveyed the parcels and marked the property lines with paint.  This allowed the contractors and the EPA to maintain records of the locations of the drums and other items it removed from the Site.  The EPA

prepared a log of every drum removed from the Site, and that log states the Site location where each drum was found, the size of the drum and the contents of the drum.

The government has put forth evidence of the costs it incurred in conducting the clean-up, and those costs have been meticulously described and supported in the record. The government hired Earth Tech, Inc. to, among other things, remove hazardous material, excavate soil and decontaminate facility infrastructure. Through May 31, 2006, the government paid Earth Tech $1,115, 087.06 for its services. The government also hired Roy F. Weston, Inc. to, among other things, provide technical support, collect samples, manage data, track costs and containers and to identify migration pathways for contaminants. Through May 31, 2006, the government paid Roy F. Weston, Inc. $150,130.76 for its services. The government also paid contractor Arctic Slope Regional Corp. $193.72 for removal activities at the Site.

In addition to those costs, the government incurred other costs with respect to the Site. It is undisputed that the EPA incurred $171,896.58 in payroll costs and $1,658.95 in travel costs for its employees' involvement with, among other things, the investigation, initial site assessment, review of sample collection and contractor oversight. The EPA incurred $27.01 in miscellaneous costs. It is undisputed that the EPA also incurred $904,207.20 in indirect costs allocated to the Site. Those expenses include rent, utilities and support staff.

The Department of Justice ("DOJ") also incurred costs with respect to the removal action. Specifically, the DOJ incurred $54,373.73 in payroll costs for attorneys and other personnel for litigation and pre-litigation work, $17,108.71 in other litigation expenses (including expert witness costs and travel expenses) and $129,065.20 in other indirect expenses (such as the cost of accounting and secretarial support, office space and supplies).

It is undisputed that $137,588.87 in prejudgment interest has accrued, based on the rate established by the Treasury Department for the Superfund Trust Fund.

Accordingly, the government seeks a total of $2,681,337.79.

## II.     Standard on a motion for summary judgment

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## III.    Discussion

CERCLA (sometimes called the Superfund law) "requires that sites contaminated by toxic wastes be cleaned up by or at the expense of the persons responsible for the contamination." *Employers Ins. of Wausau v. Browner*, 52 F.3d 656, 660 (7th Cir. 1995). CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998)

(quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)). Under CERCLA, the

EPA has the authority to effectuate toxic waste cleanup in a couple of ways. First, it can take

responsive action itself and then seek reimbursement from the potentially responsible party. 42

U.S.C. § 9607(a)(4)(A). Second, the EPA may require the responsible party to clean up the

property. 42 U.S.C. § 9606(a). Specifically, the EPA can issue an administrative order setting

out the required remedial action. The EPA can enforce its order by filing suit in federal district

court, and in that suit, the EPA can also seek civil penalties and punitive damages against a party

who failed to comply with the administrative order. 42 U.S.C. §§ 9606(b), 9607(c)(3). The

district court cannot, however, grant civil penalties or punitive damages against a party that had

"sufficient cause" for not complying with the order. 42 U.S.C. §§ 9606(b), 9607(c)(3).

In this case, the government issued UAOs to each defendant, and each defendant failed to

comply. The government proceeded to conduct the response action itself and to seek

reimbursement for the response costs. This Court has already concluded that each defendant is

liable under CERCLA for response costs. The Court now considers the government's motion for

summary judgment as to damages, including fines and punitive damages.

### A.    Amount of response costs

Under CERCLA, responsible parties are liable for "all costs of removal or remedial

action incurred by the United States Government or a State or an Indian tribe not inconsistent

with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). CERCLA also provides for the

award of interest. 42 U.S.C. § 9607 (a)(4). Although the Seventh Circuit has not weighed in on

this issue, the other Circuit Courts who have addressed the issue have concluded that "response

costs are presumed consistent with the National Contingency Plan unless a responsible party

-14-

overcomes this presumption by establishing the EPA's response action giving rise to the costs is inconsistent with the National Contingency Plan." *United States v. E.I. DuPont de Nemours & Co., Inc.*, 432 F.3d 161, 178 (3rd Cir. 2005) (collecting cases). To show that a response cost is inconsistent with the National Contingency Plan, the responsible party must show that the EPA acted "arbitrarily or capriciously" in choosing the response action. *Id.* at 179.

In this case, the government has put forth evidence that it incurred $2,543,748.92 in response costs. Neither defendant has argued that the response costs were inconsistent with the National Contingency Plan. Accordingly, the Court presumes the response costs are consistent. The Court finds that there are no genuine issues of material fact and that the government is entitled to summary judgment with respect to its damages. The government is entitled to $2,543,748.92 in response costs and $137,588.87 in statutory prejudgment interest (for a total of $2,681,337.79).

**B.     Divisibility**

The Court turns next to the question of whether Lerch and Capital Tax are jointly and severally liable for the government's response costs or whether one or both of the parties has established that the harm is divisible.

CERCLA liability is strict. *Nutrasweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 784 (7th Cir. 2000). Once a party is found to be liable, the party is jointly and severally liable (with one exception outlined below) for *all* of the EPA's response costs, "regardless of that party's relative fault." *Metropolitan Water Reclamation Dist. of Greater Chi. v. North Amer. Galvanizing & Coating, Inc.*, 473 F.3d 824, 827 (7th Cir. 2007). This might seem particularly harsh given that mere ownership of a CERCLA facility can subject one to liability. But

Congress had to choose between unfairly burdening the taxpayers with the clean-up costs or burdening potentially responsible parties; it chose the potentially responsible parties. *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 716 (2d Cir. 1993). Furthermore, any perceived harshness is tempered in a number of ways. First, CERCLA provides an innocent landowner defense to liability. *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 617 (7th Cir. 1998) ("In recognition that CERCLA liability is strict, Congress created an "innocent landowner" defense"). Had either of these defendants been able to put forth sufficient evidence at the summary judgment stage with respect to the innocent landowner defense, he or it would not have been held liable (and, hence, would not have been subjected to joint and several liability). In this case, no defendant was able to create an issue of fact on the innocent landowner defense. Second, the harshness of joint and several liability is tempered by the fact that CERCLA allows liable parties to seek contribution from other liable parties and allows a court, in considering a CERCLA contribution claim, to allocate costs using equitable principles. *See Metropolitan Water*, 473 F.3d at 828; 42 U.S.C. § 9613(f)(1) (in a contribution action, "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."). So, under CERCLA, joint and several liability is less harsh than it might first appear.

In addition, courts recognize one judicially-created exception to joint and several liability under § 107(a) of CERCLA. If a liable party can establish that the harm is divisible, then that party is not subject to joint and several liability. *Metropolitan Water*, 473 F. 3d at 827 n. 3. Courts agree that the burden of establishing divisibility is on the defendant. *United States v.*

*Alcan Aluminum Corp.*, 315 F.3d 179, 185 (2d. Cir. 2003); *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir. 2001); *O'Neil v. Picillo*, 883 F.2d 176, 178 (1st Cir. 1989).

The Seventh Circuit has said very little about the proper standard for determining whether a party has established divisibility, other than to say it is rare. *Metropolitan Water*, 473 F.3d at 827 n. 3. ("The only exception to joint liability is when the harm is divisible, but this is a rare scenario."); *see also United States v. Colorado & Eastern RR Co.*, 50 F.3d 1530, 1535 (10th Cir. 1995) ("Where defendants bear the burden of proving divisibility, responsible parties rarely escape joint and several liability."); *O'Neil,* 883 F.2d at 178-179 ("The practical effect of placing the burden on defendants has been that responsible parties rarely escape joint and several liability, courts regularly finding that where wastes of varying (and unknown) degrees of toxicity and migratory potential commingle, it simply is impossible to determine the amount of environmental harm caused by each party."); *Grigoleit v. Midland Machine Corp.*, 104 F. Supp.2d 967, 979 (C.D. Ill. 2000) ("it is rare for a responsible party to be able to demonstrate divisibility of harm, and therefore joint and several liability is the norm."). Divisibility is "not an invitation to courts to attempt to 'split the difference.'" *United States v. Township of Brighton*, 153 F.3d 307, 319 (6th Cir. 1998). When "in doubt, [courts] should impose joint and several liability." *Brighton*, 153 F.3d at 319.

The vast majority of courts that have considered the proper standard for establishing divisibility have looked to the Restatement (Second) of Torts, but several courts have noted that it should be followed only to the extent that it is compatible with CERCLA. *See United States v. Burlington Northern & Santa Fe Railway Co.*, 479 F.3d 1113, 1127 (9th Cir. 2007) (applying Restatement but modifying it "to ensure that our approach comports with the liability and

remediation scheme of CERCLA."); *United States v. Hercules, Inc.*, 247 F.3d 706, 717 (8th Cir. 2001) ("We will follow the Restatement, however, only to the extent that it is compatible with the provisions of CERCLA.").

Among the difficulties with applying the Restatement is that it is designed to apply to negligence cases and to apportion harm based on causation. Under CERCLA, however, liability is strict, regardless of causation. The applicable Restatement section allows apportionment of damages where "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm." *Restatement (Second) of Torts § 433A(1)*. Some responsible parties under CERCLA, however, are responsible regardless of causation, which makes dividing the damages based on the proportion of harm caused by various parties contrary to the plain language of CERCLA. As the Ninth Circuit recognized in *Burlington Northern*,

> PRP [potentially responsible party] status premised on ownership of a facility does not require *any* involvement in the disposal of hazardous substances. Thus, to speak of a PRP "causing" contamination of its land simply by owning land on which someone else disposes of hazardous wastes is to indulge in metaphor. At the same time, to allow CERCLA defendants, especially landowner PRPs, to prove through traditional causation analysis that they were *not* entirely liable would be to undermine the premise on which the statute designated them as PRPs to begin with.

*Burlington Northern*, 479 F.3d at 1129. There, the Ninth Circuit concluded that the only way a landowner could establish divisibility would be to establish that portions of the contamination were in no way traceable to the portions of the facility it owned. *Id.*

Like the court in *Burlington Northern*, this Court concludes that allowing a landowner–who has been found to be responsible party under the plain language of CERCLA despite not having caused the release of hazardous substances–to escape liability by establishing

-18-

that he or it did not *cause* the harm is untenable. A landowner is strictly liable under CERCLA regardless of causation unless the landowner establishes the innocent landowner defense (which Capital Tax failed to do). *See* 42 U.S.C. §§ 9607(a)(1), 9607(b). It seems to this Court that the only way–consistent with CERCLA–that a landowner can establish divisibility is to establish that the response costs are geographically divisible, i.e., by establishing that portions of the response costs or contamination are in no way traceable to the portions of the facility it owned. This is no easy task; but, it is consistent with the Seventh Circuit's limited guidance that divisibility should be rare. In *United States v. Broderick Investment Co.*, the court concluded that the harm was geographically divisible. *United States v. Broderick Investment Co.*, 862 F. Supp. 272, 277 (D. Colo. 1994). There, the contaminated groundwater was in two separate pools that had never merged. It was also clear that Burlington Northern, one of the responsible parties, had never owned a portion of the facility where the first pool was located and that there had never been any migration between the pools of water. Accordingly, the court concluded that Burlington Northern was not liable with respect to the first pool but was jointly and severally liable as to all other areas of the facility. *Broderick Investment*, 862 F. Supp. at 277.

In this case, defendant Lerch makes no argument and puts forth no facts indicating that the harm is divisible. Accordingly, the Court concludes that there are no genuine issues of material fact and the government is entitled to judgment as a matter of law with respect to damages on its § 107(a) claim against Lerch. The Court finds Lerch to be jointly and severally liable to the government for response costs and interest in the amount of $2,681,337.79.

Unlike Lerch, Capital Tax argues that the harm is divisible. Its first argument is that it should be liable for none of the response costs because it has put forth evidence that it did not

contribute to the hazardous waste disposal at the Site. The Court has already rejected this argument based on the plain language of CERCLA.

Next, Capital Tax argues that it should pay the costs for remedying harm with respect to only those five (out of the seven) Site parcels which it owned. Essentially, Capital Tax argues that the harm is geographically divisible. Capital Tax correctly points out that during the clean-up, the EPA marked the parcel boundary lines and kept records of what drums were removed from which parcel. Capital Tax believes that the costs can be divided based on where the hazardous materials sat on the day they were removed.

The Court does not believe that Capital Tax's evidence is sufficient to establish that the harm is geographically divisible. The question is not whether Capital Tax can show where the hazardous materials had settled as of the time of removal. The question is whether portions of the hazardous waste were in no way traceable to the parcels it owned.[2] In other words, Capital Tax had to put forth sufficient evidence from which a reasonable jury could conclude that the hazardous waste that was ultimately removed from the parcels (8 and 10) it did not own neither originated from the parcels it owns nor commingled with hazardous wastes on the parcels it owns. This is not easy to establish, but, again, Congress chose to put the burden on the landowner rather than the taxpayer.

Capital Tax has failed to make this showing. Unlike the defendant in *Broderick Investment*, who was able to show separate pools of contaminated water and no migration, Capital Tax has put forth no evidence that the contamination is separated or that the hazardous

---

[2]For this reason, even if Capital Tax had supported with admissible record evidence its assertion that 40% of the removal costs were associated with hazardous waste that was found on parcels 8 and 10, that fact would not have established that the harm is divisible.

materials had not migrated between or among the parcels. To the contrary, the undisputed evidence is that the parcels are contiguous plots of land comprising a single factory and that some hazardous waste migrated or otherwise moved from one parcel to another. The Site was used as one large paint operation for at least seven years. A pit in the storage yard–which encompassed two parcels that Capital Tax owned and one parcel it did not own–contained 2,540 gallons of hazardous liquid and 55 gallons of hazardous sludge. Even though Capital Tax put forth evidence that *it* never moved hazardous waste among the parcels, it is undisputed that an engineer from the Chicago Department of the Environment witnessed a trail of spilled product where containers had been moved from a warehouse on Parcel 5 (which Capital Tax owned) to the storage yard on Parcels 9, 10 and 11 (two of which Parcels Capital Tax owned). Parcel 8 stands between Parcel 5 and the storage yard. Thus, the undisputed evidence is that the contamination was not separate and that hazardous wastes migrated or otherwise moved from one area to another within the Site.

Accordingly, the Court concludes that Capital Tax has failed to put forth sufficient evidence to survive summary judgment with respect to divisibility. The Court concludes that there is no genuine issue of material fact, and Capital Tax is jointly and severally liable to the government in the amount of $2,681,337.79.

### C.  Fines and punitive damages

The government seeks fines and penalties against Capital Tax and Lerch. Against both, the government seeks daily fines and punitive damages for failure to comply with a UAO. Against, Lerch, the government also seeks a daily penalty for failure to respond to an information request.

CERCLA provides that any person "who, without sufficient cause, willfully violates, or fails or refuses to comply with, any order of the President under subsection (a) of this Section may . . . be fined not more than [$27,500] for each day in which such violation occurs or such failure to comply continues." 42 U.S.C. § 9606(b)(1). CERCLA further provides that if any person "who is liable for a release or threat of release of a hazardous substance fails without sufficient cause to properly provide removal or remedial action upon order of the President pursuant to section 9604 or 9606 of this title, such person may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund as a result of such failure to take proper action." 42 U.S.C. § 9607(c)(3). It is within the Court's discretion to determine whether to impose fines and punitive damages, and the Court may base its decision on equitable factors. *United States v. Martin*, Case No. 99-1130, 2000 WL 1029188 at *8 (N.D. Ill. July 26, 2000); *United States v. Barkman*, Case No. 98-1180, 1998 WL 962018 at *17 (E.D. Penn. Dec. 17, 1998); *United States v. DWC Trust Holding Co.*, Case No. 93-2859, 1996 WL 250011 at *8 (D. Md. Jan. 22, 1996); *Wagner Elect. Corp. v. Thomas*, 612 F. Supp. 736, 744 (D. Kan. 1985) ("Use of the term 'may' clearly denotes that the reviewing court has discretion *not* to assess punitive damages against a party failing to comply with an EPA order.").

The Court first considers daily fines for failure to comply with a UAO. In this case, it is undisputed that the EPA issued Capital Tax a UAO on August 15, 2003. It is undisputed that Capital Tax failed to comply. The government finished it response action by June 17, 2004. Accordingly, Capital Tax failed to comply for 307 days. It is undisputed that the EPA issued

Lerch a UAO on August 28, 2003. It is undisputed that he never complied. Accordingly, Lerch failed to comply for 294 days.

A sufficient cause for failing to comply is a reasonable belief that one is not liable under CERCLA. *See United States v. Barkman*, Case No. 98-1180, 1998 WL 962018 at *17 (E.D. Penn. Dec. 17, 1998) (citing *Solid State Circuits, Inc. v. United States*, 812 F.2d 383, 391 n. 11 (8th Cir. 1987). What might that entail? An example might be an entity who had taken some action to prevent further release of hazardous substances but whose action was not quite sufficient to establish an innocent landowner defense. That entity could be thought of as having sufficient cause for failing to comply because it would have had a reasonable basis on which to believe it was not liable.

In this case, Capital Tax argues that is had a good faith reason to think it was not liable because "I) CTC obtained title to the property through a tax sale; (ii) CTC did not have an opportunity before purchasing the parcels to inspect the property; iii) CTC obtained title to the parcels pursuant to an agreement with Mr. Dukatt; (iv) CTC did not bring, store, or use any of the hazardous materials found on the site parcels; v) CTC only held title to five of the seven parcels." (Capital Tax Brief at 15). Not one of these facts (or all of them in combination) is a defense to liability under CERCLA. Accordingly, Capital Tax's belief in those facts is not sufficient cause not to comply with a UAO. Nor is the fact that Capital Tax "consulted . . . an experienced environmental lawyer . . . regarding its responsibility under the UAO." *United States v. DWC Trust Holding Co.*, Case No. 93-2859, 1996 WL 250011 at *8 (D. Md. Jan. 22, 1996) ("the mere fact that an attorney has advised a potentially responsible party that he or she may have defenses to CERCLA liability should not, in and of itself, constitute 'sufficient cause'

-23-

for purposes of §§ 106 and 107 of CERCLA. . . . The party must fully disclose all relevant facts to the attorney and must seek the attorney's advice in order to determine the lawfulness of future conduct. The actual advice the attorney provides the party must itself be objectively reasonable and must be corroborated by the party's independent factual knowledge."). Capital Tax has made no argument and put forth no evidence that its attorney's advice was based on all relevant facts corroborated by the party's independent knowledge or that the advice was objectively reasonable. Capital Tax has failed to establish that it had sufficient cause for failing to comply with a UAO.

Lerch, too, argues that he had sufficient cause for failing to comply with the UAO issued to him. Lerch argues that he had been evicted from the Site, and, hence, had sufficient cause not to comply. The Court disagrees. The undisputed evidence is that Lerch was evicted from only Parcel 26. Furthermore, what is needed is evidence that Lerch had a reasonable basis on which to believe he was not liable. He has failed to make this showing.

No party has suggested to the Court an appropriate daily fine. CERCLA allows fines up to $27,500.00 per day, and the Court is aware of fines as low as $100 per day and as high as 80% of the statutory limit. In this case, the Court concludes that a daily fine of $750 will serve to deter these and other parties from ignoring future UAOs. Thus, the Court fines Capital Tax $230,250.00. The Court fines Lerch $220,500.00.

Next, the Court considers whether it should also subject Lerch and/or Capital Tax to punitive damages. Under the statute, the Court has discretion about whether to impose punitive damages but has less discretion as to the amount. If the Court awards any punitive damages, it must issue an award at least equal to the amount of the government's response costs. *See* 42

-24-

U.S.C. § 9607(c)(3) (a party who fails to comply with a UAO "may be liable to the United States for punitive damages in an amount at least equal to, and not more than three times, the amount of any costs incurred by the Fund"). The minimum amount of punitive damages the Court may award is $2,543,748.92–the amount of the government's response costs. The Court concludes that this amount is too high and, accordingly, declines to award punitive damages. The reason the Court believes that $2,543,748.92 is too high is that these defendants are already jointly and severally liable for that amount and are already individually liable for fines on top of that. Ordinarily, a responsible party who is jointly and severally liable can seek contribution from other responsible parties. In this case, however, one defendant–Pedi–has settled with the government for $330,000.00. Should the Court approve the consent decree, Pedi's liability would be capped at $330,000.00, and Capital Tax and Lerch would be unable to seek contribution from Pedi. *See* 42 U.S.C. § 9613(f)(2) ("A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."). The Court concludes that it would be inequitable to subject Capital Tax and Lerch to punitive damages in an amount roughly eight times Pedi's total liability. Accordingly, the Court declines to award punitive damages in this case.

Finally, the government seeks fines against Lerch for Lerch's admitted failure to comply with an August 8, 2003 request for information. The request asked for information regarding the types of hazardous substances used and released at the Site as well as information about how the substances were obtained, stored and disposed of. It is undisputed that Lerch received the request and that he ignored it. Lerch argues that he could not comply because he lacked access

to the Site.  Lerch fails to put forth evidence that he lacked access to his own memory, and he should have, at a minimum, contacted the EPA to share what he recalled.

For Lerch's failure to comply, the Court may assess a civil penalty of not more than $27,500.00 per day.  *See* 42 U.S.C. § 9604(e)(5)(B).  The parties do not suggest an appropriate daily penalty.  The Court will assess a penalty of $75 per day to deter future violations.  It awards the penalty from August 15, 2003 (the date by which Lerch was required to respond) to June 17, 2004 (by which time the EPA had completed its clean-up and, hence, knew the answers to the questions it asked Lerch).  Accordingly, the Court assesses a penalty of $23,100.00 against Lerch.

## IV.    Conclusion

For the reasons set forth above, the Court grants in part the government's motion for summary judgment as to damages.  Capital Tax and Lerch are jointly and severally liable to the government in the amount of $2,681,337.79.  Capital Tax is liable to the government for civil fines in the amount of $230,250.00.  Lerch is liable to the government for civil fines in the amount of $220,500.00 and civil penalties in the amount of $23,100.00.

ENTER:

George M. Marovich
United States District Judge

DATED:  August 1, 2007

-26-